WESTERN MARYLAND RAILWAY CO.

*v.*

THOMAS R. GOODWIN, TAX COMMR., *etc.*

(No. 14636)

W. VA. MOTOR DELIVERY CO., INC.

*v.*

THOMAS R. GOODWIN, TAX COMMR., *etc.*

(No. 14473)

and

UNION BARGE LINE CORP.

*v.*

DAVID C. HARDESTY, JR., TAX COMMR., *etc.*

(No. 14870)

Decided July 17, 1981.

*Noel P. Copen, Huddleston, Bolen, Beatty, Porter & Copen* for Western Maryland.

*Arden J. Curry, Thomas H. Vanderford, IV, Pauley, Curry & Thaxton,* for W.Va. Motor Delivery Co., Inc.

*Thomas N. Chambers, James R. Snyder, Jackson, Kelly, Holt & O'Farrell,* for Union Barge.

*Chauncey H. Browning,* Attorney General, *Robert Digges, Jr.,* Assistant Attorney General, for Tax Commissioner.

*Albert F. Good, Bibby & Good,* for Cook Motor Lines, et al., amicus curiae.

NEELY, JUSTICE:

These three tax cases involve the well cultivated field of the constitutional and statutory limitations on the power of the State to tax interstate commerce. The cases were briefed and argued separately before us, but we consolidated them to treat in one opinion the common issues raised. Of course, ultimately the determination of each turns on its facts, so to that extent they will be considered separately.

The cases involve the application of the State's Tax on the Income of Certain Carriers, *W. Va. Code,* 11-12A-1, *et. seq.,* [1967, 1971], particularly sections 2 and 3. *Code,* 11-12A-2 [1967, 1971] taxes a host of carriers of people and/or property for their business "beginning and ending" in this State.[1] The tax is levied on the gross income

---

[1] *W. Va. Code,* 11-12-2 [1971], substantially the same as *Code,* 11-12A-2 [1967], provides:

Every motor vehicle carrier operating on the public highways of this State and every railroad car carrier, railroad carrier, express company, pipeline company, telephone and telegraph company, airline company and any person operating a steamboat or other watercraft, for the transportation of passengers or freight, doing business in the State shall pay to the State an annual tax for each calendar year. This tax shall be equal to the gross income from all business beginning and ending within the State multiplied by the respective rates as follows: Motor vehicle carriers, railroad car carrier, railroad carrier, express companies, pipeline companies, airline companies, any person operating a steamboat or other watercraft and telegraph companies, three and three-tenths percent, and telephone companies, three and seventy-four one hundredths percent: Provided, that any motor vehicle carrier which is an urban or suburban bus line shall be taxed at the rate of one and sixty-five one hundredths percent of such gross income and any motor vehicle

generated by such business. *Code,* 11-12A-3 [1967, 1971] taxes the same carriers, in addition to the tax in section 2, (giving a credit for the taxes paid under section 2) for the portion of their interstate transportation business which takes place in this State.[2] This tax on interstate business

---

carrier which is a taxi or cab company or a company which hauls waste, refuse or garbage shall be taxed at the rate of two and five-tenths percent of such gross income.

[2] The relevant portions of *Code,* 11-12A-3 [1971], essentially the same as *Code* 11-12A-3 [1967], are:

In addition to the tax imposed in the preceding section [§ 11-12A-2], every motor vehicle carrier operating on the public highways of the State and every railroad carrier, railroad car carrier, express company, pipeline company, telephone and telegraph company, airline company and any person operating a steamboat or other watercraft for the transportation of passengers or freight, doing business in this State shall pay an annual tax for each calendar year on the net income earned within the State equal to three and seventy-four one hundredths percent of such net income for all other carriers included in this section: Provided, that any motor vehicle carrier which is an urban or suburban bus line or a taxi or cab company or a company which hauls waste, refuse or garbage, five percent of such net income. Net income shall be determined as follows:

(a) The net income of motor vehicle carriers earned within the State shall be determined by ascertaining a sum bearing the proportion to the total net income of the motor vehicle carrier that its business done in West Virginia measured in motor vehicle miles of motor vehicle carrier operation, bears to all business done, measured in like fashion;

(b) The net income of railroad carriers earned within the State shall be determined by ascertaining a sum bearing the proportion to total net income of the carriers that its business done in West Virginia, measured in ton-miles, bears to all business done, measured in like fashion;

. . . .

(e) The net income of airline companies and any person operating a steamboat or other watercraft for the transportation of passengers or freight earned within the State shall be determined by ascertaining a sum bearing the proportion to the total net income of the corporation that its business done in West Virginia, measured in passenger-miles in the case of airline companies and ton-miles in the case of any person operating a steamboat or other watercraft, bears to all business done, measured in like fashion;

. . . .

(g) In computing the tax imposed by this section, the total net income of a taxpayer who shall have been taxed under the preceding section [§ 11-12A-2], shall be reduced by an amount bearing the proportion to such total net income that the gross income of the taxpayer which is

is levied on a carrier's net income by multiplying that income by a fraction, the numerator of which is West Virginia cargo miles and the denominator of which is total cargo miles in the carrier's system.

None of the taxpayers in these cases challenges the State's power to tax interstate commerce in the abstract, but they do challenge the legitimacy of one or the other of these taxes as applied to particular aspects of their activities, either on statutory or constitutional grounds.

The State's taxing powers with regard to interstate commerce are limited by the Due Process and Commerce Clauses of the *U.S. Const.*, amend. XIV and Art. 1, sec. 8, cl.3. Together, these provisions require that the incidence and particular applications of state taxes meet a four-part test. A tax will not be sustained unless the tax "(1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and, (4) is fairly related to the services provided by the State." *Maryland v. Louisiana,* ____ U.S. ____, (1981). This test is referred to in *Maryland* as the *Complete Auto* test, after the ruling in *Complete Auto, Inc. v. Brady,* 430 U.S, 274, (1977), and it will be referred to as such in the course of this opinion. Subsequent Supreme Court rulings allow us to expand briefly on the contemporary requirements of the *Complete Auto* test.

### 1. Nexus

The U.S. Supreme Court as often as not has spoken about what is *not* sufficient in a particular case to meet the nexus requirement. The determination of the issue is fact-bound. However, some observations can be made generally. It seems that the nexus criterion inevitably runs into the fourth criterion, the relation to services provided by the State. *See Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). In *National Geographic Soc'y. v. California Bd. of Equalization,* 430 U.S. 551, 557, (1977), the Court stated that: "It is particularly significant ... that the Court [in *Standard*

---

the measure of the tax under the preceding section bears to its total gross from all business done wherever conducted.

*Pressed Steel Co. v. Washington Rev. Dep't*, 419 U.S. 560 (1975)] characterized as 'frivolous' the argument that the seller's in-state activities were so thin and inconsequential that the tax had no reasonable relation to the protection and benefits conferred by the taxing State." It is clear that, when a direct relationship can be demonstrated between the tax and the cost to the State of the benefits and protections it affords, there is a sufficient nexus for taxation, *see Id.* at 558, but the opposite is not true, i.e., nexus may exist even if the in-state activities are not shown to cost the State as much as the amount of the taxes. Neither is it necessary for there to be a nexus between the particular in-state activities of the taxpayer and the activity sought to be taxed. *Id.* We conclude that purposive, revenue generating activities in the State are sufficient to render a person liable for taxes, *See International Shoe Co. v. Washington*, 326 U.S. (1945).

## 2. Fair Apportionment

This requires little explanation. A tax on a person involved in both wholly intrastate commerce and interstate commerce with in-state aspects, must be tailored so as to attach primarily to revenue derived from in-state activities. In the case of transportation, it is true most of the time that a tax related to cargo or passenger miles traveled in state or to the miles of the line in state will be valid, *see Norfolk & W. Ry. v. North Carolina*, 297 U.S. 682, 684 (1936); *Ott v. Mississippi Valley Barge Line Co.*, 336 U.S. 169 (1949).

## 3. Discrimination

Essentially this criterion requires equal treatment of interstate and local commerce, *see Maryland v. Louisiana*, 451 U.S. 725, 68 L.Ed. 2d 576, 101 S.Ct. 2114 (1981). No state may " 'impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business, ' " *id.*, quoting *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959). *See, too, Boston Stock Exchange v. State Tax Comm'n* 429 U.S. 318 (1977).

## 4. Relation To Services

The very recent decision in *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 68 L.Ed. 2d 884 (1981) is rather instructive on this issue. *Commonwealth Edison* makes it clear that there need not be any direct correlation between the value of benefits afforded the taxpayer by the State and the cost of the tax to the taxpayer. Once the nexus requirement has been met, the fourth criterion "imposes the additional limitation that the *measure* of the tax must be reasonably related to the extent of the contact, .. the activities or presence of the taxpayer in the State." *Id.* at ___, 101 S.Ct. at 2950. Therefore, "when the measure of a tax is reasonably related to the taxpayer's activities or presence in the State... the taxpayer will realize, in proper proportion to the taxes it pays, '[t]he only benefit to which it is constitutionally entitled ... [:] that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes.' *Carmichael v. Southern Coal & Coke Co.*, 301 U.S., at 522," *id.* at ___, 101 S.Ct. at 2960.

The actual holding in *Complete Auto, supra*, was simply that a privilege tax on interstate commerce is not *per se* unconstitutional. However, the case was heralded at the time as a clarification of the previously murky waters which were the bane of any court's trying to interpret the law of taxation of interstate commerce, *see, e.g., Chesapeake and Potomac Co. v. State Tax Dep't*, 161 W.Va 77, 239 S.E.2d 918 (1977). Time and subsequent Supreme Court opinions have proven that that expectation was not unfounded, for *Complete Auto* was the touchstone for all subsequent opinions. However, it is necessary to sample briefly some of the U.S. Supreme Court's earlier rulings to see the constraints which were deemed to bind our rulings before *Complete Auto.*

In a case which originated in this State, the Supreme Court held unconstitutional a State tax that in effect directly taxed purely interstate commerce, for such a tax would have been a burden on interstate commerce, *Eureka*

prohibition on burdensome direct taxation of gross income from interstate commerce was reaffirmed in, among others, *Freeman v. Hewit*, 329 U.S. 249 (1946), but that decision also admitted that the states could measure a variety of taxes against the net income of persons doing business or owning property in the State, including income from interstate commerce. However, in *Spector Motor Service v. O'Connor*, 340 U.S. 602 (1951), the Court ruled that any state tax on the privilege of conducting interstate commerce in a state was *per se* unconstitutional. That this was a matter only of semantics and legislative craftsmanship became embarrasingly apparent by the time *Spector* was overruled by *Complete Auto*. Just three years before *Spector* the Court had held that a "franchise or excise" tax levied against the value of the capital assets of a pipeline company involved in interstate transmission was valid, *Memphis Gas Co. v. Stone*, 335 U.S. 80 (1948). In *Railway Express Agency v. Virginia*, 347 U.S. 359 (1954), the Court held that Virginia's "annual license tax" levied against the privilege of doing business in the state and imposed on gross receipts was unconstitutional. But a similar tax on gross receipts enacted to replace the unconstitutional one, and labeled a "franchise tax," was upheld by the Court in *Railway Express Agency v. Virginia*, 358 U.S. 434 (1959). Other examples might be cited, but these should suffice to show the uncertain perimeters of permissible taxation before *Complete Auto, supra, see* 430 U.S. at 279-85.

The relevant decisions of this Court concerning taxation of interstate carriers followed the Supreme Court's decisions. In *American Barge Line Co. v. Koontz*, 136 W. Va. 747, 68 S.E.2d 56 (1951), we held that the predecessor to *Code*, 11-12A-2 [1967], which imposed a "privilege tax" on "business beginning and ending entirely within the State" as well as on an apportioned share of total gross income from all activities, was invalid as to the latter portion in that it was a direct and unreasonable burden on interstate commerce. The State could tax the barge lines for delivering goods between two points within West Virginia but not for delivering goods whose origin or destination were out of state. In *Battle v. Baltimore & Ohio R.R.*, 149

W.Va. 810, 143 S.E.2d 331 (1965), we held that the application of the privilege tax on apportioned gross income of the B. & O. Railroad was invalid as an unconstitutional burden on interstate commerce. (For a recent discussion of *Battle see Chesapeake and Potomac, supra.*)

It is clear that our cases were conforming to Supreme Court decisions in holding that excessive taxation of interstate commerce in some instances is an unconstitutional burden and that a privilege tax on carriers could not extend to income derived from interstate commerce. Appellees direct our attention to these cases because they maintain that the words "business beginning and ending" mean purely intrastate commerce, *see American Barge Line Co. v. Koontz,* 136 W. Va. 747, 68 S.E.2d at 61, 63, 64 (1951); *Battle v Baltimore & Ohio R.R.,* 149 W. Va. 810, 143 S.E.2d at 337 (1965). But in both *American Barge* and *Battle* this distinction was dictum. Also, the tax they were construing was a "privilege tax" and as we noted earlier, it was thought at the time that a tax on the privilege of engaging in interstate commerce was *per se* unconstitutional. A tax on the income of a company involved in interstate commerce, which is the tax before us, was not then and is not now *per se* unconstitutional. For the purposes of determining the range of the tax in *Code,* 11-12A-2 [1967, 1971], we find it far simpler and far more reasonable to apply the plain meaning of the words "beginning and ending" rather than to make nice distinctions between "intrastate" and "interstate" income. For in taxation, absent ambiguity or uncertainty, we will apply the statute and not construe it, *West Virginia Tractor Co. v. Hardesty,* ____ W. Va. ____, 280 S.E.2d 270 (1981); *J. D. Moore, Inc. v. Hardesty,* 147 W. Va. 611, 129 S.E.2d 722, 724 (1963).

The last issue we must address before we turn to the specifics of each case is whether we can rely on post-1976 precedent to assess taxes for tax years 1967-73. At least one appellee argues that this is an unfair, retroactive imposition of new law. Succinctly stated, the argument is that if we had ruled on these cases in the years in which the

taxes had become due, we would have ruled differently because *Complete Auto* had not yet been decided. To this there is a succinct answer. We are not convinced that we would have had to rule differently in earlier years. Whether we would have ruled differently is a matter of speculation only. Also, *Complete Auto* explicitly overruled prior case law, yet the taxes there were levied retroactively. Thus we find little problem with holding taxpayers liable for taxes owed between 1967 and 1973.

### WESTERN MARYLAND RAILWAY CO.
### (McHugh, J., did not participate in the
### decision of this case.)

Western Maryland Railway, appellee here, is a freight hauling railroad carrier incorporated outside this State and it is qualified to do business in West Virginia. An assessment was made against Western Maryland in 1975 for Carrier Income Taxes for the years 1970-73, and this assessment was affirmed by the Tax Commissioner, less penalty, in 1977. Western Maryland appealed this decision to the Circuit Court of Kanawha County and the Commissioner's assessment was overruled. The State Tax Commissioner appeals that decision to this Court.

Among its other activities, Western Maryland is engaged in switching railcars between connecting line haul tracks and between line haul track and local spurs. It receives separate payments for this switching. It is also paid a separate tariff for undue detention of its cars by customers in loading and unloading, and this tariff is known as demurrage. Western Maryland classified the revenue from switching and demurrage as "intrastate" or "interstate" depending upon the prior and subsequent line haul portion of the cars' movement. If the prior movement originated outside of West Virginia or if the subsequent destination was a point outside of the State, the revenue was labeled "interstate." Only when the origin and destination of the car were both within West Virginia did the railway classify the income generated as "intrastate." The switching and demurrage Western Maryland called interstate is regulated by the Interstate Commerce Commission while the West Virginia Public Service Commission has jurisdiction

over the switching and demurrage appellee called intrastate.

During the years covered by the audit the appellee reported its income from what it designated interstate switching and demurrage under *Code*, 11-12A-3 [1967, 1971] for Carrier Income Tax purposes. The tax commissioner determined that all income from switching services performed and detention of cars wholly within West Virginia should be reported and taxed under the provisions of *Code*, 11-12A-2 [1967, 1971], regardless of appellee's characterization as intra– or interstate. A portion of the 1977 assessment against appellee was due to this reclassification.

Western Maryland also computed its net transportation income for 1971 in accordance with federal income tax methods. This resulted in a net operating loss for that year. Consonant with federal tax practices, it then carried portions of that loss back to 1970 and forward to 1972 and 1973, the result being that Western Maryland showed no West Virginia net income for any of those years. After the audit, the tax commissioner determined that these loss carry-backs and carry-forwards are inappropriate in computing West Virginia net carrier income and he reassessed appellee's tax after disallowing the loss distributions.

## A.

The tax commissioner contends here that the activity of switching cars and the activity of detaining cars both begin and end wholly within West Virginia and so should be taxed under *Code*, 11-12A-2 [1967, 1971]. Western Maryland counters by saying that these activities are inextricably connected with and a necessary incident of interstate commerce, and so are taxable only under *Code*, 11-12A-3 [1967, 1971]. In effect their argument is that switching and demurrage are part and parcel of the movement of the cars across state lines, notwithstanding the fact that the physical acts of switching and detention occur within the State.

We find little merit to the argument that demurrage is not taxable under *Code,* 11-12A-2 [1967, 1971]. It can as easily be said that demurrage is incidental to the loading and unloading of cargo in this State as that it is an incident of the interstate transportation of that cargo. There is no question in our minds that payments for undue detention of cars within this State provide revenues from "business beginning and ending" in West Virginia. Therefore, demurrage income from detention of cars within West Virginia, whatever the origin or destination of the cars, is taxable under *Code,* 11-12A-2 [1967, 1971].

Switching is a closer question in that it at times involves switching cars that have come from one state onto lines that will take the cars to another state. In this respect, switching might be seen as a part of the flow from one state through West Virginia on to another state. However, our reading of the record satisfies us that switching is a separate, distinct, time-consuming operation and not incidental to the interstate movement of goods. So long as switching is a distinct and identifiable activity we hold that switching is a business which begins and ends in West Virginia and appellee is liable for taxes on switching revenue under *Code,* 11-12A-2 [1967, 1971].

Having determined that appellee's activities are taxable under the statute we must determine whether such a tax is constitutionally valid. Since the tax is on revenues derived from in-state activities, there is no question that both the nexus and apportionment requirements are met. Furthermore, the tax does not discriminate against interstate commerce: local and interstate commerce must pay the tax alike. Appellee benefits from the State's police and fire protection while engaged in switching cars and appellee is free to use the State's laws and courts to enforce its rights against West Virginia customers and others found in the State. We find, therefore, that the tax is fairly related to the services provided by the State to Western Maryland. Finally, we note that since these activities of appellee take place wholly within West Virginia and they are identified by it as such, there is no chance that the State's imposition of this tax will lead to multiple taxation

by another state of the same revenue source and thereby impose an unconstitutional burden on interstate commerce.

Appellee makes a separate constitutional argument that is based on the 1980 amendment to *Code*, 11-12A-2. The amendment exempts motor vehicle carriers from the tax under 11-12A-2 when the activity is "part of an uninterrupted continuation of interstate transportation . . . [and] without a container change or warehousing." Appellee argues first that this amendment evidences a legislative determination that our understanding of the pre-1980 statute is incorrect. Second, it argues that such exemption for motor vehicle carriers only, and not rail, water and other carriers, violates the Equal Protection Clause, *U.S. Const.*, amend. XIV, the "equal and uniform" taxation clause, *W. Va. Const.*, Art. X, Sec. 1, and 49 U.S.C. 11503(b) (1979 sup.) which prohibits taxes which discriminate against railroads. From this it concludes that we should not apply the statute as we have proposed.

If the 1980 amendment shows anything about prior legislative intent, we will adhere to the rule that an amendment is meant to change the law, *see West Virginia Bd. of Dental Examiners v. Storch,* 146 W. Va. 662, 122 S.E.2d 295, 300 (1961); *Kisner v. Fiori,* 151 W. Va. 850, 157 S.E.2d 238, 242 (1967). Therefore, we find that the amendment bears out our understanding that, absent legislated exemptions, *Code,* 11-12A-2 [1967, 1971] taxes all carrier business beginning and ending in the State. If the 1980 amendments violate the constitutional or statutory provisions above, then we should declare that the amendment, not the law it amends, is void. Even if we were to do that, appellee would still be liable for the tax under section 2. That question is not before us, however, and we need not decide it now. Appellee's taxes are being assessed under the pre-1980 statute and the question of whether the 1980 amendment discriminates in any way is not involved at all.

B.

The entire West Virginia tax code is hardly drafted with the precision of the federal *Internal Revenue Code of 1954*. Consequently, there are occasional inartful uses of language which cause trouble for the Commissioner, the taxpayer, and the courts. Such is the reference to the use of federal income tax computations at issue in this case. Certainly it is convenient for a taxpayer to be able to use its federal computations for State purposes; such a simplification is highly laudable. However, in the case before us, the real issue is one of substantive law and not mere accounting: Is there authority in *Code*, 11-12A-3 [1971] for losses in one year to be carried either forward or backward? We find no authority to this effect, and tax-loss-carry-forward is a crucial, substantive, issue in tax law. There is no problem using the federal figures; it is only the effect of the forms which is at issue. Our statute imposes a yearly tax on each year's income; the statute gives no credit for prior or future losses. This is in sharp contrast to the explicit authority in I.R.C. § 172 (1976). If the Legislature had intended such a credit they would have given it directly, and it is unreasonable to infer from the general authority allowed in *Code*, 11-12A-6 [1967] to use federal forms for accounting purposes that a substantive benefit of considerable magnitude was intended to be conferred in direct controvention of the plain words of *Code*, 11-12A-3 [1967].

The discretion granted the commissioner by *Code*, 11-12A-6 [1967] to consider federal net income is for his and taxpayers' convenience. His exercise of that discretion by asking taxpayers for their federal net income confers the benefits of convenience, not the benefits of a tax credit. However, we hold that when the commissioner asks for federal income figures and then assesses the tax at a higher level based on other figures not requested, or at a rate not otherwise indicated, he may not assess a penalty in addition to the revised assessment. Hence the commissioner was correct in waiving the penalty in this case, especially with respect to the additional assessment based on his disallowing the loss distributions.

## C.

We conclude, therefore, that the decision of the Circuit Court of Kanawha County should be reversed and the case should be remanded for further proceedings consistent with this opinion.

## WEST VIRGINIA MOTOR DELIVERY CO., INC.

The State Tax Commissioner in 1977 affirmed an additional assessment against West Virginia Motor Delivery under *Code*, 11-12A-2 [1967, 1971], less penalty, as assessed by his office in 1975 for tax years 1970-73. West Virginia Motor Delivery, appellee here, appealed that decision to the Circuit Court of Kanawha County. That court ruled that appellee would be liable for the tax in question under current doctrine, but the court refused to apply its decision retroactively. The State Tax Commissioner appeals from that ruling and we reverse.

West Virginia Motor Delivery is engaged in the business of delivering meat by refrigerated truck. In the years in question, it received shipments of meat at its warehouse near Dunbar, West Virginia, from meat packers, all of whom were located out-of-state. In general, the meat was transferred directly from the shippers' trucks to appellee's trucks, but at times appellee stored the meat in its warehouse overnight. Appellee then delivered the meat to retailers both inside and outside West Virginia. It has been estimated that approximately 88% of appellee's income came from deliveries made to places in West Virginia and 12% from deliveries out-of-state.

Appellee believed that its operations were part of the continuous interstate shipment of goods and so it paid taxes under *Code*, 11-12A-3 [1967, 1971] only. In part appellee's conclusion in this regard was based on a decision of the State Tax Commissioner in 1964 that appellee was not liable for taxes on such deliveries under *Code*, 11-12A-4 [1962], predecessor to *Code*, 11-12A-2 [1967]. The Tax Commissioner now argues that part of appellee's business involves the delivery of goods wholly within state, and that appellee is therefore liable for tax on income from in-state deliveries under *Code*, 11-12A-2 [1967, 1971] as well as under

*Code,* 11-12A-3 [1967, 1971]. As noted above, the circuit court agreed that, under *Complete Auto,* appellee could be so assessed, but the court determined that such assessment amounted to retroactive imposition of the tax and the court refused to impose such tax retroactively.

### A.

We certainly agree with the circuit court's findings of fact with regard to appellee's in-state deliveries. Appellee's business is a continuation of the transportation of goods from other states to points in West Virginia, but with regard to deliveries it makes in-state, the only ones in question here, *its* business begins and ends in West Virginia. It is true that the shipments consigned to appellee are prepackaged and pre-billed by the out-of-state shipper and that appellee is paid by the out-of-state shipper and not by the ultimate consignee. It is true that the meat packers are engaged in interstate commerce and appellee may also be engaged in interstate commerce. But *Code,* 11-12A-2 [1967, 1971] does not distinguish between interstate and intrastate commerce. Appellee's business consists of taking meat from one place in West Virginia and delivering it to another place in West Virginia and such a business is clearly taxable under *Code,* 11-12A-2 [1967, 1971] as business "beginning and ending" in West Virginia.

We disagree with the circuit court's conclusion that taxing appellee on this business amounts to retroactive application of new law for the reasons outlined in the introduction to these cases. We only add that retroactivity is not an issue here because we are not overruling any prior decisions.

### B.

However, we do find it necessary to take up the question raised by appellee that the State is estopped from making this assessment by virtue of the 1964 decision of the Tax Commissioner. The record discloses that the Assistant Tax Commissioner adjusted an assessment made against appellee for 1958-62 "under the provisions of Chapter 11, Article 12A of the Code of West Virginia." In testimony, appellee's president stated that this adjustment held

appellee liable for taxes under *Code*, 11-12A-4 [1962] only for deliveries made for West Virginia meat packers to West Virginia customers, but not for deliveries made for out-of-state packers to West Virginia customers. We will assume *arguendo* that this is so.

The question is what effect does such a ruling by the Tax Commissioner have on an attempt to assess the same taxpayer under a different statute (albeit a "substantial re-enactment" of the previous one, *see, Chesapeake and Potomac Co. v. State Tax Dep't.* ___ W.Va. ___, 239 S.E.2d 918, 925 (1977)) and for different years. The Tax Commissioner was empowered at the time of the previous assessment to conduct hearings on petitions by taxpayers for reassessment to issue rulings based on the hearings. It was further provided that "unless an appeal is taken within thirty days from service of this notice [of the ruling], the tax commissioner's decision shall be final," *Code*, 11-12A-8(c) [1962]. The current assessment is governed by substantially the same language in *Code*, 11-12A-12 [1967], and assessments since 1978 are governed by *Code*, 11-10-10 [1978].

In *Cunningham v. County Court of Wood County*, 148 W. Va. 303, 134 S.E.2d 725, 729 (1964), we stated that the "general rule is that an estoppel may not be invoked against a governmental unit when functioning in its governmental capacity." Both parties agree that tax collection is a governmental, as opposed to proprietary, function. To the extent that *Code*, 11-12A-8(c) [1962] is in derogation of the common law rule enunciated in *Cunningham, supra,* it binds the State with respect to assessments for particular taxpayers, particular years, and particular taxes. Thus the Tax Commissioner could not attempt to assess West Virginia Motor Delivery for taxes under *Code*, 11-12A-4 [1962] after thirty days had passed from his decision on the matter for the years 1958-62. However, the 1964 ruling is in no way binding with respect to assessments under *Code*, 11-12A-2 [1967, 1971] for the years 1970-73.

If appellee had wanted a definitive ruling from the Tax Commissioner about its prospective liability under *Code*, 11-12A-2 [1967], it could have done so under the provisions of *Code*, 29A-4-1 *et seq*. [1964]. Those sections set out the declaratory judgment procedures to be used by citizens dealing with State agencies, including the Tax Department, concerning "the applicability to any person, property or set of facts of any rule or statute enforceable by it," *Code*, 29A-4-1 [1964]. Such declaratory judgments may be binding. The *Code* also provides for the hearings and fact-finding procedures necessary to prevent arbitrary, careless, or groundless judgments. *Id*. Finally, these judgments may be subjected to judicial review, *Code*, 29A-4-2 [1964].

## C.

We can now briefly address the constitutionality of this tax as applied to this taxpayer. West Virginia Motor Delivery is a West Virginia Corporation. It does business in this State with consignees primarily in this State. There is no question that there is a substantial nexus with the State. The tax in question taxes income derived only from appellee's activities in State, so it is fairly apportioned. Local and interstate commerce must pay the same tax for the same activities, so that tax is not discriminatory. Finally, being a West Virginia corporation located within the State, there is no question that the tax is fairly related to the services provided by the State to appellee. The State provides roads and police protection which are of direct benefit to appellee, and the State provides schools which undoubtedly are used by appellee's employees' children. We conclude that the assessment made by the Tax Commissioner, less penalty, was proper under the statute and under the constitution.

Therefore, the decision of the Circuit Court of Kanawha County is reversed and the case is remanded for proceedings consistent with this opinion.

## UNION BARGE LINE CORPORATION

This case presents the question of whether there is sufficient nexus to support a tax on appellee Union Barge

Line Corporation and whether the tax is fairly related to the services provided appellee by the State. We find that both questions should be answered in the affirmative and, therefore, we uphold the assessment, but we remand the case for the determination of certain factual questions concerning the amount of cargo ton miles carried in this State.

In 1972 the State Tax Department assessed Union Barge under *Code*, 11-12A-3 [1967] for net income derived during 1967-70 from Union Barge's so-called one-point and pass-through traffic. One-point traffic involves either carrying goods to a point in this State from another state or carrying goods from West Virginia to another state. Pass-through traffic involves carrying goods from one state to another across West Virginia without stops. In 1977 the Tax Commissioner affirmed a modified version of the assessment, less penalty. Union Barge made a timely appeal to the Circuit Court of Kanawha County in which the assessment was overruled. The Tax Commissioner appeals to this Court from that ruling.

Union Barge Line Corporation is a Pennsylvania corporation not qualified to do business in the State of West Virginia. It is headquartered in Pittsburgh and is engaged in transporting freight in barges along the navigable waters of the United States. A substantial portion of its business travels the Ohio River and a small amount travels along the Kanawha River. The bed of the Kanawha River belongs to West Virginia as does the bed of the Ohio River up to the low water mark on the Ohio side. The United States controls the waters of both rivers. The Company tows some barges between two points within West Virginia but such traffic comprises only one fifteen-hundredth (1/1500) of all its traffic everywhere, according to 1977 figures. Union Barge did pay taxes on this traffic during the audit years but it payed no tax on the far more substantial one-point and pass-through traffic which occurred in West Virginia.

Union Barge does not maintain an office or place of business in West Virginia and it does not have any agents or employees in the State. The circuit court found that

appellee does not use any docks, properties, facilities, or services of the State of West Virginia or any of its subdivisions. The United States government is responsible for the regulation and servicing of navigable waterways, of which the Ohio and Kanawha Rivers are a part. Accordingly, the court determined that there was insufficient nexus between Union Barge and the State to support imposition of any tax. In this regard, it found controlling *American Barge Line Co. v. Koontz*, 136 W. Va. 747, 68 S.E.2d 56 (1951). There this Court held in a factually similar situation that the imposition of a privilege tax on apportioned gross income of a barge company was an undue burden on interstate commerce. We also stated that "there is certainly no taxable incident in connection with through traffic of the plaintiffs occurring within the State of West Virginia which would afford a basis for the tax," *id.* at 63.

We disagree with the circuit court's ruling and therefore reverse. To the extent that *American Barge* invalidated the application of a different tax, it is not binding in the case at bar. To the extent that it is inconsistent with the findings *infra* concerning nexus, it is overruled. We find that there is sufficient nexus between Union Barge and this State to support the imposition of a tax on it and that the tax in question is fairly apportioned, non-discriminatory, and fairly related to the services provided appellee by the State.

A.

Apppellee is engaged in business which begins and ends within West Virginia for which it payed taxes under *Code,* 11-12A-2 [1967]. Inasmuch as the question is whether there is a substantial nexus between a taxpayer and the State to support the imposition of *any* tax, the fact that appellee does not contest the validity of taxing its wholly in-state business is at least persuasive that some nexus exists with regard to some operations. That, however, is not dispositive since arguably appellee could have identifiable, separate, business operations which are so far removed from this State as to make them immune to our taxation.

However, the activities in question do involve a West Virginia "nexus" since our view of the record suggests that appellee has far more substantial contacts with this State than were found by the circuit court. Appellee's vice-president testified that its wholly in-state business was primarily done to accommodate its interstate customers or to accommodate other carriers. This suggests that its in-state business, while small, was helpful in the maintenance of other one-point and pass-through business. Approximately four percent of appellee's total cargo ton miles passed through West Virginia on one-point business. Approximately six percent of appellee's total cargo ton miles travel through West Virginia as pass-through traffic. This suggests substantial activity conducted within the State.

Appellee owns almost all of the barges it tows. When appellee's barges are dropped off for loading and unloading in this State, they are docked for days at a time at docks owned by companies doing business in this State. It should not matter, contrary to the circuit court's suggestion, that the docks are owned by private corporations and not by the State of West Virginia. Appellee charges its customers a demurrage tariff for undue delay in loading and unloading of the barges. This is income earned exclusively in this State as the result of one-point business in West Virginia.

Appellee at times buys food and fuel for its tugboats and crews from West Virginia businesses along the rivers, although this is an infrequent occurrence. It also sometimes uses West Virginia as drop-off and pick-up points for its employees, some of whom live in West Virginia. Should any of the barges of tugs break down or become damaged in West Virginia, appellee will at times have them repaired in this State or send its own crews here to inspect and/or repair the equipment.

### B.

Given this factual basis, there are numerous Supreme Court cases which support the conclusion that there is a substantial nexus between taxpayer and the State in this case to support taxation. *Ott v. Mississippi Valley Barge*

*Line Co.*, 336 U.S. 169 (1940) involved the imposition of an *ad valorem* tax on barge companies based on the number of miles of their lines in Lousiana, the state of taxation, compared with the number of miles in the lines overall. The Court noted at 170-71 that:

> In the trips to Louisiana a tugboat brings a line of barges to New Orleans where the barges are left for unloading and reloading. Then the tugboat picks up loaded barges for return trips to ports outside that State ... [The] turn-arounds are accomplished as quickly as possible with the result that the vessels are within Louisiana for such comparatively short periods of time as are required to discharge and take on cargo and to make necessary and temporary repairs.

This is almost identical to the description we have of appellee's one-point operations in West Virginia. There the Supreme Court held that there was sufficient nexus for the imposition of the *ad valorem* tax.

Undoubtedly appellee will protest that in *Ott, supra*, the taxpayers each had an office or agent in Louisiana while appellee has neither office nor agent in West Virginia. We find such protest without merit. The existence of an agent or office in Louisiana was given no emphasis in the Court's determination of that case. The controlling factor was that the appellees were engaged in business in the state and they had property there that could be taxed. Towing barges which were docked in Louisiana provided the nexus; with that established, "the only question whether the tax in practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing State. [Citation omitted.] Those requirements are satisfied if the tax is fairly apportioned to the commerce carried on within the State." *Id.* at 174.

We conclude on the basis of *Ott* and the factual analysis presented above that the assessment here meets three criteria of *Complete Auto*: appellee's one-point business alone is sufficient to provide the substantial nexus

necessary for taxation by the State;[3] the tax in *Code*, 11-12A-3 [1967] is fairly apportioned in that it is assessed on the portion of net income which is derived from in-state activities; and, it does not discriminate against interstate commerce by making it pay higher taxes than local commerce.

## C.

The appellee asserts that the Tax Commissioner has not demonstrated that appellee derives any benefits from the State and, therefore, the tax fails on the fourth criterion—its relation to benefits received. However, the burden is on the taxpayer to show that the inferences of benefits received through its in-state activities are unfounded. "In this type of case the taxpayers must show that the formula places a burden upon interstate commerce in a constitutional sense," *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 463 (1959). Appellee's barges are docked at piers in West Virginia for substantial periods throughout the year and there is every reason to believe that they are provided with police and fire protection by the

[3] *See, too, Standard Oil Co. v. Peck*, 342 U.S. 382, 382-83 (1952) *(Ott* "placed inland water transportation on the same constitutional footing as other interstate enterprises"); *Braniff Airways, Inc. v. Nebraska Bd. of Equalization*, 347 U.S. 590, (1954) (upholding *ad valorem* tax on aircraft; issue "devolves into the question of whether eighteen stops per day by appellant's aircraft is sufficient contact with Nebraska to sustain that state's power to levy an apportioned *ad valorem* tax on such aircraft," at 600-01, answered affirmatively); *Alaska v. Arctic Maid*, 366 U.S. 199 (1961) (upholding Alaska licensing tax on freezer ship assessed against value of fish stored; tax valid even though ship never entered Alaska waters because local fishermen sold fish to the ship and the ship sent long-boats into Alaska waters); *Japan Line Ltd. v. County of Los Angeles*, 441 U.S. 434, 442 (1979) ("various instrumentalities of commerce may be taxed, on a properly apportioned basis, by the nondomiciliary States through which they travel") (dictum). It is true that most of these cases deal with property taxes, but we find that irrelevant to the issue of nexus because nexus has to do with the power of the states to levy taxes. As appellee states in its brief, "the form of the tax is irrelevant to the due process questions of nexus and state benefits." These cases establish that West Virginia may constitutionally tax barge companies whose equipment passes through the State so long as the other criteria of the *Complete Auto* test are met.

State. Appellee's vice-president testified that if a crewman becomes ill while traveling through West Virginia he may be taken to a West Virginia hospital, and most hospitals receive some State aid.

In section A we outlined a variety of services and opportunities available to and used by appellee that are provided by people in West Virginia. Certainly these things contribute to the viability of appellee's operations overall. This contribution, protected by the State, is something for which the State, in the name of the people of West Virginia, can ask for taxes in return. "A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the State has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society," *Wisconsin v. J. C. Penney Co.*, 311 U.S. 435, 444 (1940).

This case must be remanded to the circuit court for further proceedings, however, because the appellee did raise a substantial factual matter with regard to apportionment which was not resolved by the circuit court. The appellee alleges that the Ohio River has shifted so that for some distance, as appellee's barges pass West Virginia, they actually are traveling across Ohio and not this State. If that, in fact, is the case, then the tax assessment should be reduced accordingly.

For the reasons set out above, the decision of the Circuit Court of Kanawha County is reversed and the case is remanded for further proceedings consistent with this opinion.

GENERAL CONCLUSION RELATING TO ALL CASES

Over the years, in interpreting the Commerce Clause, the U.S. Supreme Court has attempted to preserve unencumbered trade among the states while also allowing the states to make interstate commerce pay its own way. *Complete Auto* has expanded and certainly rationalized the taxing powers of the states. It has also provided the courts with a rational and coherent test for state taxes on interstate commerce. However, the semantic niceties which ema-

nated from the Supreme Court decisions before *Complete Auto* perhaps forced on state legislatures an arbitrary, "tax as tax can" attitude with regard to interstate commerce, thereby producing hodgepodge taxation.

In the four years since *Complete Auto* the arbitrariness has remained. The states perhaps have taken advantage of the expansive aspects of *Complete Auto* more often than is theoretically justified based on the economics of interstate commerce. In some instances the *Complete Auto* test has succeeded in eliminating rapacious new taxes of the sort that the Commerce Clause was designed to prevent, *see, e.g., Maryland v. Louisiana*, 451 U.S. 725, 68 L.Ed.2d 576, 101 S.Ct. 2114 (1981). Unfortunately, the effect of several new applications of old taxes by different states in combination can be just as rapacious as a single new tax, but this effect can easily go unnoticed. Since each application of an old tax by itself is more likely to satisfy the *Complete Auto* requirements of nexus, fair apportionment, anti-discrimination, and fair relationship, taxpayers must make substantial factual showings if they are to contradict the *prima facie* evidence of constitutionality and prove that the taxes in combination exceed state power or unduly burden interstate commerce. Absent such showings, courts are left no choice but affirm such taxation.

Hence we realize that the results in the decisions discussed in this opinion as well as in our recent decisions, *Chesapeake and Potomac Co. v. State Tax Dep't.*, 161 W.Va. 77, 239 S.E.2d 918 (1977) and *J. C. Penney Co., Inc. v. Hardesty*, 164 W.Va. 525, 264 S.E.2d 604 (1979), may give the appearance that we will allow the State to expand its taxing powers in sponge-like fashion and with only perfunctory review. But this is not the case. The taxpayer's burden of proof in such cases is substantial, but it is not insurmountable nor one established just yesterday, *see Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 463 (1959); *Standard Pressed Steel Co. v. Rev. Dep't. of Washington*, 419 U.S. 560, 563 (1975). In fact, we discussed this same problem less than two years ago in *Richardson, Gordon and Assocs. v. Hardesty*, decided in *J. C. Penney, supra*, 164 W.Va. 525, 264 S.E.2d 604 (1979). We

stated there that for a taxpayer "to avoid a state tax under the Commerce Clause it is necessary to demonstrate sufficient duplication of taxation that there is an actual discrimination against interstate commerce," *id.* at 612. The same burden was enunciated concerning apportionment and relation to services. But there, too, there was no serious effort factually to substantiate the constitutional claims. So *here*, too, we are left exasperated because "there is no development in this record of this particular question other than naked allegations," *id.*

As the U.S. Supreme Court has said, "logically it is impossible, when the tax is fairly apportioned, to have the same income taxed twice. In practical operation, however, apportionment formulas being what they are, the possibility of the contrary is not foreclosed, especially by levies in domiciliary States. But that question is not before us." *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 462-63 (1959). The question was before it, however, in *Norfolk and W. Ry. Co. v. Missouri Tax Comm'n*, 390 U.S. 317 (1968). In that case the Court held that the taxpayer had carried successfully its "heavy burden" by proving that the application of a mileage formula for apportionment had "led to a grossly distorted result, " *id,* at 326.

We, too, will be receptive to factual showings by taxpayers involved in interstate commerce that the taxes as applied to them are not properly apportioned, or that they actually receive no benefits from the State, or that the taxes discriminate against interstate commerce. We stand ready to reverse tax assessments when taxpayers successfully support the heavy burden of proof and the State does not disprove taxpayers' evidence that the imposition of certain taxes is unconstitutional in any of those ways. To help minimize the potential for such unfair taxation, we urge the Legislature to re-evaluate its tax policy concerning interstate commerce and take advantage of the rationalizing potential offered by *Complete Auto* and its progeny.

*Reversed and remanded.*