307 S.E.2d 620

**The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF WEST VIRGINIA**

v.

**Herschel H. ROSE, III, Tax Commissioner of the State of West Virginia.**

**No. 15704.**

Supreme Court of Appeals of West Virginia.

July 7, 1983.

Rehearing Denied Oct. 20, 1983.

David B. Frost, Charleston, John W. Plaatje, Washington, D.C., for appellant.

Chauncey H. Browning, Jr., Atty. Gen., William F. Carroll, Deputy Atty. Gen., Charleston, for appellee.

NEELY, Justice:

Chesapeake and Potomac Telephone Company ("C & P") is a West Virginia corporation that owns and operates telephone facilities in West Virginia. It is also a subsidiary of the American Telephone and Telegraph Company ("AT & T") and is affiliated with the twenty-two Bell operating companies that provide interstate telephone service throughout the nation. One part of its business is the provision of intrastate telephone service for approxi-

mately 60% of the calls that are made within the State of West Virginia. In its capacity as an affiliate of AT & T, it is a partner in an enterprise that allows persons in West Virginia to reach out and touch someone across state lines.

This case arises from a 1977 decision of the Tax Commissioner holding the interstate revenues of C & P subject to the tax on gross income under *W.Va.Code,* 11–12A–2 [1971][1] rather than to the net tax on income prescribed by *Code,* 11–12A–3 [1971].[2] On 27 April 1982 the Circuit Court of Kanawha County affirmed. C & P now appeals a deficiency assessment of $6,591,-687.94. Although the financial stakes are substantial and the length of the record is daunting, the central issue in this case is not novel and the facts which inform our decision can be stated with relative simplicity.

It would appear that "[O]nce again we are presented with, ' "the perennial problem of the validity of a State tax for the privilege of carrying on, within a state, certain activities" related to a corporation's operation of an interstate business.' [Citations omitted]." *Chesapeake and Potomac Co. of West Virginia v. State Tax Department,* 161 W.Va. 77, 239 S.E.2d 918, 924 (1977), quoting *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1976). In fact, however, the case *sub judice* concerns the more narrow problem of whether the transmission and receipt of long-distance phone calls across state lines constitutes "business beginning and ending within the State" under the Carrier Income Tax. West Virginia adopted this taxing scheme when the constitutional standard for taxation of interstate commerce was extremely obstructive to a state's revenue gathering efforts. (For a discussion of the evolution of that doctrine, *see* Section III of this opinion). We find that C & P's interstate telephone business does not "begin and end" in West Virginia, and therefore, is not taxable under our own statute. *Code,* 11–12A–2 [1971]. Consequently, we do not reach a constitutional issue in this case.

I

Telecommunication is one of the miracles of our age and this Court is fortunate that its technical complexities need not be understood in order to render a decision in this case. Some elementary discussion of engineering principles, however, is required to flesh out the issues before us. Phone calls require the completion of a direct electrical circuit between caller and receiver. Because it would be impractical to connect each of the millions of phones throughout the country directly to every other telephone, individual phones are instead con-

---

1. *W.Va.Code,* 11–12A–2 [1971], provides:

   Every motor vehicle carrier operating on the public highways of this State and every railroad car carrier, express company, pipeline company, telephone and telegraph company, airline company and any person operating a steamboat or other watercraft, for the transportation of passengers of freight, doing business in the State shall pay to the State an annual tax for each calendar year. This tax shall be equal to the gross income from all business beginning and ending within the State multiplied by the respective rates as follows: Motor vehicle carriers, railroad car carrier, railroad carrier, express companies, pipeline companies, airline companies, any person operating a steamboat or other watercraft and telegraph companies, three and three-tenths percent, and telephone companies, three and seventy-four one hundredths percent: Provided, that any motor vehicle carrier which is an urban or suburban bus line shall be taxed at the rate of one and sixty-five one hundredths percent of such

   gross income and any motor vehicle carrier which is a taxi or cab company or a company which hauls waste, refuse or garbage shall be taxed at the rate of two and five-tenths percent of such gross income.

2. The relevant portions of *Code,* 11–12A–3 [1971], are:

   In addition to the tax imposed in the preceding section [§ 11–12A–2], every motor vehicle carrier operating on the public highways of the State and every railroad carrier, railroad car carrier, express company, pipeline company, telephone and telegraph company, airline company and any person operating a steamboat or other watercraft for the transportation of passengers or freight, doing business in this State shall pay an annual tax for each calendar year on the net income earned within the State equal to three and seventy-four one hundredths percent of such net income for all other carriers included in this section: ....

nected to local switching machines run by companies like C & P. These machines are in turn connected to transmission facilities owned and operated by other phone companies in a relay system that allows for communication across the continent.

The facilities of any one company in that chain are capable of providing phone service only within the geographical area in which that company operates. In the case of C & P, its facilities do not extend beyond West Virginia's borders. In order for calls to be completed beyond the respective corporate fiefdoms, it is necessary for these companies to act cooperatively. For example, if a student at Marshall University wants to call his home in Wilmington, Delaware to wish his mother a happy birthday, his call begins through facilities owned and operated by C & P. It is then transmitted across Maryland by the AT & T affiliate in that State. Finally, the Delaware company completes the circuit. Obviously, this same system can work in reverse. The crucial fact is that in none of these transmissions does C & P both begin and end the "business."

The economics of the partnership underline what the technological imperatives suggest—interstate telecommunications is in no sense a business that begins and ends at state borders. If the college student's call home is not completed, either because the home line is busy or because no one answers, C & P receives no remuneration for its efforts. Only when all partners in the network achieve the desired result of a completed call does any of them receive payment. C & P's independent transmission function, which the tax commissioner argues begins and ends within West Virginia, does not in and of itself yield any profits.

Furthermore, the partnership arrangement of the AT & T affiliates is such that each subsidiary receives a set percentage of the revenues accruing from interstate calls. In other words, C & P's percentage of the take is not directly dependent upon the amount of service it provides within this State's borders in any particular period. Instead, it receives revenues as a member in good standing of the consortium and not as a direct result of its business beginning and ending within this State.

The economic realities that lead to this arrangement are worthy of brief explication. Just as airline fares between major metropolitan areas are often relatively cheap because of the economies of scale attendant upon high demand for service, the telephone trunks connecting populous cities generate a disproportionately high percentage of the long distance system's profits. By establishing a definite schedule for the sharing of revenues, AT & T creates an economic incentive for C & P and other subsidiaries with a relatively low volume of interstate calls to maintain adequate service. Thus, it is not only the case that C & P's revenues from interstate calls are not generated by business beginning and ending within the state; it is also an economic fact that part of C & P's profits from interstate calls represents a subsidy to the company provided by other more profitable affiliates. Some of these revenues may be generated by calls that do not begin, end or even pass through West Virginia.

## II

This Court's earlier decision in the consolidated cases of *Western Maryland Railway Co. v. Goodwin, W. Va. Motor Delivery Co. Inc. v. Goodwin* and *Union Barge Line Corp. v. Hardesty*, 167 W.Va. 804, 282 S.E.2d 240 (1981) makes clear that none of the revenues derived from what is essentially an interstate business are subject to gross income tax even if some activities incidental to that business occur wholly within West Virginia. *Id.*, 167 W.Va. at 813–814, 282 S.E.2d at 246–47. That decision also indicated that in cases concerning the Carrier Income Tax we found it simpler and more reasonable to apply the plain meaning of the words "beginning and ending" rather than attempting to distinguish between "intrastate" and "interstate" commerce. *Id.*, 167 W.Va. at 812, 282 S.E.2d at 246. This common sense approach is appropriate in tax cases where it is our duty to apply the statute and not liberally construe it. *West Virginia Tractor Co. v.*

*Hardesty*, 167 W.Va. 511, 280 S.E.2d 270 (1981); *J.D. Moore, Inc. v. Hardesty*, 147 W.Va. 611, 129 S.E.2d 722, 724 (1963).

■ In moving away from traditional "interstate commerce" analysis in this area, this Court hoped to free both the taxing authorities and commercial parties from the necessity of engaging in the nebulous, even metaphysical analysis that has led courts in the past to find that growing wheat for personal consumption is interstate commerce because of its theoretically inevitable impact on wheat prices, *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), and could in the future lead them to find that the death of a pet dog in West Virginia impacts on interstate commerce because it effects the kharma of laborers in Indiana. Instead, we established the straightforward test that a business begins and ends within West Virginia if it is a "separate, distinct, time-consuming operation and not incidental to the interstate movement of goods." *Western Maryland Railway, supra*, 167 W.Va. at 815, 282 S.E.2d at 247. It is that standard which we apply in this case and under that standard interstate phone calls cannot be held to be business beginning and ending within West Virginia. A discussion of the facts of *Western Maryland, Motor Delivery* and *Union Barge, supra*, provides a necessary perspective on how the rule enunciated in our established case law should be applied to the case *sub judice*.

*Western Maryland Railway* involved the imposition of a gross income tax on two of the revenue-generating activities of a freight-hauling railroad carrier, the switching of cars between connecting line haul tracks and the retention of cars during loading and unloading, which is known as demurrage. In finding that gross taxation was permissible with regard to both of these income sources, the Court emphasized that switching and demurrage were separate and identifiable activities that were performed wholly within West Virginia and that had economic value irrespective of the cargo's ultimate destination outside of the State.

■ The present case is very different from *Western Maryland Railway* and consequently the application of the same principle yields a different result. If *Western Maryland Railway* had involved the uninterrupted passage of freight cars through the State of West Virginia, no separate and identifiable business activity would have been commenced and concluded within our borders and the imposition of a gross income tax would not have been permissible under our statute. It is that situation which would be the railroad analogue to C & P's role in the transmission of interstate phone calls.

*West Virginia Motor Delivery Co.* involved a company that transported meat by refrigerated truck from its West Virginia warehouse to meatpackers who were also located in West Virginia. The company argued that because the meat was shipped to it from out-of-state it's further activities were part of the flow of interstate commerce and, therefore, not taxable under *Code* 11–12A–2[1]. While this Court agreed that the meat moved through interstate commerce, it held that the tax was appropriate because West Virginia Motor Delivery's business of shipping that meat from Dunbar, West Virginia to various retailers in West Virginia began and ended within the state. The tax was not applied, however, to the 12% of West Virginia Motor Delivery's income that resulted from deliveries made outside the state.

C & P is not an independent contractor which simply completes interstate transmissions within West Virginia. It is a single link in an unbreakable chain and any attempt to view it as otherwise is hopelessly artificial. The same relays that make possible the completion of calls within West Virginia allow interstate calls to pass through the state. Because C & P is not an autonomous entity in the field of interstate telecommunications and because none of its activities pertaining to the commencement or completion of calls within this state is separate and distinct from its role in the transmission of calls across our borders, *West Virginia Motor Delivery* does not control the present case.

The facts of *Union Barge Line Corp.* are particularly instructive. In that case, this Court allowed a *net* income tax on both "one-point traffic" (carrying goods between a location in West Virginia and a point in a different state) and "pass-through traffic" (carrying goods from one state to another state through West Virginia). While upholding both of these taxes, we noted explicitly that this case differed from *American Barge Line Co. v. Koontz*, 136 W.Va. 747, 68 S.E.2d 56 (1951), which had involved a *gross* income tax and in which that tax was held improper. Despite the fact that some of the barge company's activities began and ended within West Virginia, a gross tax was not proper because the essential nature of the business did not begin and end within the state.

If C & P were an independent operation that generated income by moving interstate phone transmissions across the state, it would be engaged in a "business beginning and ending within the state" despite the fact that the enterprise as a whole involved interstate commerce. That is not, however, the nature of C & P's business. It is a partner in an endeavor that profits only when communications beginning in one state reach their ultimate recipient in another state. It is only when the transaction touches more than one state that C & P or any of its partners profits. Clearly, this is not the sort of business that is taxable under *Code* 11–12A–2 [1971].

### III

It should be noted that our analysis of this case has been limited to a consideration of what is allowable under the West Virginia statute. We do not hold today that a tax on gross revenues obtained from interstate telephone transmissions is an unconstitutional interference with interstate commerce. In fact, our reading of recent United States Supreme Court cases leads us to believe that West Virginia could impose such a tax if fairly apportioned. *See Exxon v. Department of Revenue of Wis-*

*consin*, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980). This point is worthy of some elaboration.

Although it may appear counter-intuitive for a state's statute to place greater limits on its revenue gathering capacity than are constitutionally mandated, as Justice Holmes once remarked, "Upon this point a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921). As early as 1819, Chief Justice Marshall remarked that "the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. 316, 431, 4 L.Ed. 579 (1819). For most of this nation's history, a concern with the confiscatory potential of taxation has led the Supreme Court to impose narrow restrictions on the power of states to tax interstate commerce. Justice Frankfurter articulated the traditional approach:

> Our starting point is clear .... [t]he Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the states.... This limitation on State power ... does not merely forbid a State to single out interstate commerce for hostile action. A State is also precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between states. *Freeman v. Hewit*, 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946).

In *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1976), the Supreme Court moved away from this traditional approach and expanded the state's power to tax interstate commerce. Under the standard established in *Complete Auto* and its progeny[3] a state tax of interstate commerce will be upheld if it meets a four-part test. The tax will be sustained if it: "(1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and, (4)

3. *See, e.g., Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981); *Mobile Oil Corp. v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980); *Department of Revenue of Washington v. Association of Washington Stevedoring Companies*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978).

is fairly related to the services provided by the State." *Maryland v. Louisiana*, 451 U.S. 725, 754, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576 (1981).

The differences between this test and that articulated by Justice Frankfurter are significant. While in the past the mere fact that a tax impeded the flow of interstate commerce made its constitutionality questionable, the present state of the law is that such a tax can pass constitutional muster so long as the state is not discriminating against interstate activity, the tax is related to state services to the taxed entity and it is fairly apportioned. Because West Virginia's statute was drafted to comply with the constitutional standard in force before *Complete Auto*, the state's tax provisions are more restrictive than they must be to comply with the currently applicable federal law. Mindful of that fact, we limit our holding today to a finding that the imposition of a gross income tax on interstate telephone transmissions violates the clear meaning of the statute adopted by West Virginia's legislature.

Accordingly, for the reasons given above, the judgment of the Circuit Court of Kanawha County is reversed and this case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.