The CHESAPEAKE AND OHIO RAIL-WAY COMPANY; The Baltimore and Ohio Railway Company; and Western Maryland Railway Company, Plaintiffs,

v.

Herschel H. ROSE, III, Tax Commissioner of the State Tax Department of West Virginia; and Dan R. Taylor, Director, Business Tax Division, State Tax Department of West Virginia, Defendants.

Civ. A. No. 82–2564.

United States District Court,
S.D. West Virginia,
Charleston Division.

Dec. 30, 1985.

Noel P. Copen, Huntington, W.Va., Everett B. Gibson, Esq. & W. Clary Lunsford, Memphis, Tenn., James W. McBride, Washington, D.C., for plaintiffs.

Mary Carol Holbert, Asst. Atty. Gen., Tax Div., Charleston, W.Va., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court upon the request for declaratory and injunctive re-

lief brought by The Chesapeake and Ohio Railway Company, The Baltimore and Ohio Railway Company, and Western Maryland Railway Company (hereinafter, the railroads). Following an evidentiary hearing, briefs and exhibits have been submitted by the parties.

Each of the railroads operates as a common carrier by rail in the State of West Virginia. The railroads seek to enjoin the assessment and collection of what they contend is a discriminatory portion of the West Virginia carrier income tax which is imposed upon railroads and other common carriers. W.Va.Code §§ 11–12A–1 through 24 (1983 & Supp. 1985).

The basic contention of the railroads is that the carrier income tax operates as a discriminatory and unlawful tax pursuant to section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4–R Act), Pub.L. No. 94–210, § 306, 90

Stat. 54 (1976), 49 U.S.C. § 11503.[1] In particular, the railroads rely upon subsection 306(1)(d) which, the court has determined, prescribes that a state may not impose any discriminatory tax upon a common carrier by railroad.[2] Defendants, who are responsible for the assessment and collection of business taxes levied on railroads by the State of West Virginia, deny that the taxes at issue are discriminatory.

## The Railroad Revitalization and Regulatory Reform Act

The complaint in this action was brought under the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4–R Act). The action is premised on subsection 306(1)(d) of the 4–R Act which provides that it is unlawful for a state to impose "any other tax which results in discriminatory treatment of a common carrier by railroad."[3]

---

1. The court will follow the Fourth Circuit approach in referring to the original text of § 306 for purposes of analysis.

    In accordance with Pub.L. No. 94–473, 92 Stat. 1466 (1978), § 306 was moved from its original location at 49 U.S.C. § 26c and certain changes in language were made. The statute calling for recodification of the Interstate Commerce Act makes clear, however, that the changes in language were not to affect the substance of § 306. *See also* H.Rep. No. 1395, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 3009. As the parties, the district court, and other courts, *see, e.g., Alabama Great Southern R.R. v. Eagerton,* 663 F.2d 1036 (11th Cir.1981); *Ogilvie v. State Board of Equalization,* 657 F.2d 204 (8th Cir.1981), *cert. denied,* 454 U.S. 1086 [102 S.Ct. 644, 70 L.Ed.2d 621] (1981); *but see State of Arizona v. Atchison, T. & S.F.R.R.,* 656 F.2d 398 (9th Cir.1981), have done, we will refer to the original text of § 306 for purposes of analysis.

    *Clinchfield Railroad Company, et al. v. Lynch,* 700 F.2d 126, 128 (4th Cir.1983).

2. In a memorandum order entered on August 22, 1983, the court rejected the defendants' contention that the scope of section 306 is limited to property taxes or taxes in lieu of property taxes. *See also Richmond, Fredericksburg & Potomac Railroad Co. v. Dept. of Taxation, Commonwealth of Virginia,* 762 F.2d 375 (4th Cir. 1985).

3. Section 306 of Pub.L. No. 94–210 as a whole provides that:

    Sec. 306. Part I. of the Interstate Commerce Act (49 U.S.C. 1 et seq.), as amended by this Act, is further amended by inserting therein a new section 28, as follows:

    "Sec. 28. (1) Notwithstanding the provisions of section 202(b), any action described in this subsection is declared to constitute an unreasonable and unjust discrimination against, and an undue burden on, interstate commerce. It is unlawful for a State, a political subdivision of a State, or a governmental entity or person acting on behalf of such State or subdivision to commit any of the following prohibited acts:

    "(a) The assessment (but only to the extent of any portion based on excessive values as hereinafter described), for purposes of a property tax levied by any taxing district, of transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property.

    "(b) The levy or collection of any tax on an assessment which is unlawful under subdivision (a).

    "(c) The levy or collection of any ad valorem property tax on transportation property at a tax rate higher than the tax rate generally applicable to commercial and industrial property in the same assessment jurisdiction.

    "(d) The imposition of any other tax which results in discriminatory treatment of a common carrier by railroad subject to this part.

As early as 1961, Congress began investigating the taxation of railroads by state and local governments. Section 306 was enacted as part of a comprehensive program aimed at revitalizing the nation's railroads and strengthening the transportation system. S.Rep. No. 94–499, 94th Cong., 2d Sess. (1976), *reprinted*, 1976 U.S. Code Cong. & Ad.News 14, 20. Congress identified inadequate financial resources available for the improvement and modernization of rail facilities as one of the major problems facing railroads. *Id.* at 14, 15. A connection between inadequate financial resources and discriminatory taxation was discovered. It was noted that:

> There is little question as to the existence of discriminatory property tax practices against railroads.... Since, generally, they are only remotely related to the economic performance of the carrier, property taxes have a regressive effect on the carrier's financial posture and earnings which, because of intermodal competition, cannot always be passed along.

S.Rep. No. 91–630, 91st Cong., 1st Sess. 1, 3, 4 (1969).

The 4–R Act was the congressional solution for state tax discrimination against railroads which had imposed financial burdens upon the railroad industry. Such taxation was determined to be an impermissible burden upon interstate commerce. One goal of the 4–R Act was to revitalize the railroad industry by assisting the industry to become competitive in the capital markets. It was noted that:

> "(2) Notwithstanding any provision of section 1341 of title 28, United States Code, or of the constitution or laws of any State, the district courts of the United States shall have jurisdiction, without regard to amount in controversy or citizenship of the parties, to grant such mandatory or prohibitive injunctive relief, interim equitable relief, and declaratory judgments as may be necessary to prevent, restrain, or terminate any acts in violation of this section, except that—
> "(a) such jurisdiction shall not be exclusive of the jurisdiction which any Federal or State court may have in the absence of this subsection;
> "(b) the provisions of this section shall not become effective until 3 years after the date of enactment of this section;
> "(c) no relief may be granted under this section unless the ratio of assessed value to true market value, with respect to transportation property, exceeds by at least 5 per centum the ratio of assessed value to true market value, with respect to all other commercial and industrial property in the same assessment jurisdiction;
> "(d) the burden of proof with respect to the determination of assessed value and true market value shall be that declared by the applicable State law; and
> "(e) in the event that the ratio of the assessed value of all other commercial and industrial property in the assessment jurisdiction to the true market value of all such other commercial and industrial property cannot be established through the random-sampling method known as a sales assessment ratio study (conducted in accordance with statistical principles applicable to such studies) to the satisfaction of the court hearing the complaint that transportation property has been or is being assessed or taxed in contravention of the provisions of this section, then the court shall hold unlawful an assessment of such transportation property at a value which bears a higher ratio to the true market value of such transportation property than the assessed value of all other property in the assessment jurisdiction in which is included such taxing district and subject to a property tax levy bears to the true market value of all such other property, and the collection of any ad valorem property tax on such transportation property at a tax rate higher than the tax rate generally applicable to taxable property in the taxing district.
> "(3) As used in this section, the term—
> "(a) 'assessment' means valuation for purposes of a property tax levied by any taxing district.
> "(b) 'assessment jurisdiction' means a geographic area, such as a State or a county, city, township, or special purpose district within such State which is a unit for purposes of determining the assessed value of property for ad valorem taxation;
> "(c) 'commercial and industrial property' or 'all other commercial and industrial property' means all property, real or personal, other than transportation property and land used primarily for agricultural purposes or primarily for the purpose of growing timber, which is devoted to a commercial or industrial use and which is subject to a property tax levy; and
> "(d) 'transportation property' means transportation property, as defined in regulations of the Commission, which is owned or used by a common carrier by railroad subject to this part or which is owned by the National Railroad Passenger Corporation."

For many years the cash generated by the American railroads has not been sufficient to meet capital requirements of the industry, and the return on investments has not been sufficient to enable the railroads to finance capital expenditures by selling stock or by incurring additional debt. The rate of return on rail investment has been less than the cost of capital to finance that investment for many years.

. . . .

The rail industry is in an era of ever-increasing competition for private investment capital, and the railroads are year-by-year worsening in respect of their relative strength in the struggle for capital funds.

. . . .

The FSP [Final System Plan of the United States Railway Association] is quite correct in bottoming the plight of the rail industry's present difficulties on its historic unsatisfactory rate of profitability. Because of this, equity financing has become a virtual reliquary of the past. However, even as to debt financing, in terms of the industry as a whole, the industry's current earning power is simply inadequate to presently finance its foreseeable substantial capital needs. What is required are steps that are designed to improve industry's rate of profitability coupled with a reasonably constructed form of Federal financial aid to the industry.

S.Rep. No. 94–499, 94th Cong., 2d Sess. (1976), *reprinted,* 1976 U.S. Code Cong. & Ad.News 14, 16, 36, 37. Thus, section 306 was one portion of a comprehensive plan to improve the rail industry's ability to compete.

### The West Virginia Business and Occupation Tax

The State of West Virginia's major business tax is the Business and Occupation Tax (B & O tax). W.Va.Code §§ 11–13–1 through 29 (1983 & Supp.1985). Although the B & O tax is technically a tax on the privilege of doing business, it is measured by gross receipts of those engaging in business activities. W.Va.Code § 11–13–2 (1983 & Supp.1985). The concept of privilege which is common in state business taxation justifies such taxation under the benefits received theory.

The B & O tax has a very broad application and reaches nearly all businesses and professions in that "any individual, firm, partnership, copartnership, joint adventure, association, corporation, trust or any other group or combination acting as a unit" is subject to tax. B & O Tax Regs. 1.1. Business is defined to include all activities engaged in, or caused to be engaged in with the object of direct or indirect gain or economic benefit. The B & O tax is a classified tax with differential rates. The B & O tax creates 26 different classifications of taxable activity. The rates of taxation in 1983 ranged from a low of .27 for wholesaling to a high of 8.63 for natural gas. W.Va.Code §§ 11–13–2a–m (1983 & Supp.1985).

### The West Virginia Carrier Income Tax

The carrier income tax is imposed on "every motor vehicle carrier operating on the public highways of [West Virginia] and every railroad car carrier, railroad carrier, express company, pipeline company, telephone and telegraph company, airline company and any person operating a steamboat or other watercraft, for the transportation of passengers or freight." W.Va.Code §§ 11–12A–2 and 3 (1983 & Supps.1984, 1985). The carrier income tax is levied annually on the gross income of transportation and related activities beginning and ending within West Virginia at a rate of 3.3%. W.Va. Code § 11–12A–2 (1983 & Supps.1984, 1985). Additionally, an annual tax is imposed on the apportioned net income of transportation and related activities earned within West Virginia at a rate of 6.6%. W.Va.Code § 11–12A–3 (1983 & Supps.1984, 1985). "This tax on interstate business is levied on a carrier's net income by multiplying that income by a fraction, the numerator of which is West Virginia cargo miles and the denominator of which is total cargo miles in the carrier system." *Western Maryland Railway Co. v. Good-*

*win,* 282 S.E.2d 240 (W.Va.1981). If the taxpayer is subject to the gross receipts portion of the carrier income tax, then the total net income of the taxpayer is reduced when computing the net income portion of the tax. W.Va.Code § 11–12A–3 g (1983 & Supps.1984, 1985). The reduction is performed by a fraction, the numerator of which is the gross income subject to the gross income tax, and the denominator of which is total gross income. W.Va.Code § 11–12A–3 g (1983 & Supps.1984, 1985).

Like the B & O tax, the carrier income tax is essentially a tax on the privilege of doing business. The B & O tax and the carrier income tax are similar to the extent that they are both imposed on gross receipts. However, as just noted, the carrier income tax also imposes a tax on net income which arises from interstate activities. No such modification exists under the B & O tax. The carrier income tax might be simply described as a hybrid between a pure gross receipts tax, such as the B & O tax, and a pure net income tax such as the corporate net income tax. Lathrop, "Due Process and Commerce Clause Considerations under the West Virginia Business and Occupation and Carrier Income Taxes— *J.C. Penney* to *Milacron,*" 85 W.Va.L.Rev. 307, 309 (1983). In 1985, the Legislature repealed the annual tax on incomes of certain carriers effective July 1, 1987. W.Va. Code § 11–12A–24 (1983 & Supp.1985). Currently, there are no provisions for the taxing of carriers subsequent to July 1, 1987.[4]

The Class Of Taxpayers To Which<br>Railroads Are To Be Compared

The initial issue that must be addressed is to whom must the railroads be compared

for the purpose of determining whether or not taxation discrimination exists in violation of section 306. The railroads argue that they should be compared with commercial and industrial taxpayers generally. The defendants assert that any comparison of railroad taxation should be made only with similarly situated businesses.

At the outset, the court observes that the subsection in question, 306(1)(d), is framed in general language which provides no operative definition of discrimination. It fails to specifically identify comparable taxpayers and provides no standards by which to determine the existence of discrimination. Indeed, the subsection provides no guidance as to its application.

It is on the basis of the absence of an express definition of the discrimination prohibited by subsection 306(1)(d) that the defendants argue that discrimination should be judged according to historical and constitutional standards developed from Fourteenth Amendment and commerce clause principles.[5] The defendants assert that neither the equal protection clause nor the commerce clause precludes states from classification for the purposes of taxation. According to the defendants, a rational system of taxation has been devised by the State of West Virginia wherein taxes are tailored to the extent of the taxpayers' activities in West Virginia. Such tailoring is done in order to take into consideration the differing degree to which multi-state businesses are involved in in-state business activities. Defendants also set forth that the rate of various business taxes is con-

---

**4.** West Virginia also imposes a corporation net income tax on a corporation's West Virginia net income which is patterned after the Federal Corporation Income Tax. W.Va.Code §§ 11–24–1 through 41 (1983 & Supp.1985). Prior to March of 1983, the rate of taxation under this tax was 6% and taxes paid under the business and occupation tax and the carrier income tax were creditable against the corporation net income tax liability. Subsequently, the rate of taxation was raised to 7% and the amount of credit allowable from the business and occupation and the carrier income taxes was reduced to 50% of net liability. W.Va.Code § 11–24–9

(1983 & Supp.1985). The amendments of 1985 provided that the business and occupation and carrier income tax credits shall expire and not be authorized or allowed for any taxable year beginning after June 13, 1987. W.Va.Code § 11–24–9c (1983 & Supp.1985).

**5.** For a concise discussion of such considerations with respect to gross receipts taxes, see Report of Special Subcommittee on State Taxation of Interstate Commerce, H.R.Rep. No. 565, 89th Cong., 1st Sess. 1033–61 (1965).

sidered in terms of the services and benefits accorded various classes of businesses. Practical considerations such as profitability and the degree to which a tax can be passed on to consumers are important variables. Defendants assert that all these factors are used in devising a varied state taxation system and argue that to take account of such factors is not discrimination but rather is the realistic acknowledgement of differences among taxpayers. Thus, defendants contend as follows:

[D]iscrimination in the area of business activity taxes occurs only when businesses whose activities are connected with the state in a similar fashion and whose operations are of the same general type are taxed differently. In this case, plaintiffs would face discriminatory tax treatment only if their activities were taxed differently from similarly circumstanced business.... Since the States' carrier tax applies equally to all carrier business, plaintiffs' business taxation is identical to similarly circumstanced businesses with whom they compete.

Defendants' Pre-trial Brief at 33.

The contentions of the defendants should be considered within the context of the development and evolution of business taxation generally in West Virginia. Jack M. McCarty, chief counsel to the House Finance Committee of the House of Delegates of the West Virginia Legislature for fifteen years, was qualified as an expert witness in the field of West Virginia business taxation. Tr. 71.[6] McCarty testified that the B & O approach to taxation was developed in the early 1920's, that it is a privilege tax and the largest revenue producer in West Virginia. Tr. 71–2. According to McCarty, the carrier tax, although at one time an integral part of the B & O tax, developed separately because the legislature saw the necessity for a more sophisticated method for taxing multi-state businesses. Tr. 73. Additionally, such taxation needed to comply with federal law and constitutional requirements. Tr. 73. The goal was to tax nothing more than those activities that occurred within West Virginia's borders. Tr. 73. The factor creating the distinction between business classed under the carrier tax and business classed under the B & O tax was the amount of multi-state activity. Tr. 73.

Formerly the carrier tax was called the transportation privilege tax and operated as a companion to the B & O privilege tax. Tr. 74. In *State ex rel. Battle v. Baltimore & Ohio Railroad Company*, 149 W.Va. 810, 143 S.E.2d 331 (1965), *cert. denied*, 384 U.S. 970, 86 S.Ct. 1859, 16 L.Ed.2d 681 (1966), the West Virginia Supreme Court of Appeals held the transportation privilege tax unconstitutional in that it was violative of the commerce clause of the United States Constitution. In amending and rewriting the transportation privilege tax, the legislature basically made semantic changes and removed any reference to the term privilege from the tax law. The tax was then characterized as an income tax. Tr. 75; *Chesapeake & Potomac Co. v. State Tax Dep't.*, 161 W.Va. 77, 239 S.E.2d 918 (1977). The roots of the carrier income tax then are grounded in a privilege tax system and the revenues, in substance, constitute a privilege tax. Tr. 77; *City of Huntington v. C. & P. Tel. Co.*, 154 W.Va. 634, 177 S.E.2d 591 (1970).

Although Congress specifically defined the comparison group as other commercial and industrial property for the purposes of determining whether a "property" tax is discriminatory, no comparison class was identified for the purpose of evaluating "other taxes" under subsection 306(1)(d). In *Alabama Great Southern Railroad Co. v. Eagerton*, 663 F.2d 1036 (11th Cir.1981), the court dealt with the issue of license taxes. The State of Alabama levied a 2½% tax on intra-state gross receipts on the railroads. The majority of Alabama businesses were subject to a modest flat fee license tax. Initially, the Eleventh Circuit held that the phrase "any other tax" in subsection 306(1)(d) prohibits all forms of state taxation which result in discriminatory treatment of common carriers by rail-

---

**6.** Hearing, February 16 and 17, 1984 (Tr.).

road, concluding that the tax on railroads fell within the definition of "any other tax." Next, respecting the identification of a class for comparison purposes, the Alabama Revenue Commissioner presented arguments similar to those made by the defendants here,[7] arguing that Fourteenth Amendment and commerce clause standards should govern the determination of the existence of discrimination. It is plain that the Eleventh Circuit rejected the argument as follows:

> Until this law was passed, as pointed out by the appellants, states could constitutionally classify railroads differently from all other taxpayers for the imposition of state taxes without violating the equal protection clause of the Fourteenth Amendment. It was the obvious purpose of Congress to put an end to this practice, where such treatment of the railroads as a class was discriminatory in effect.

*Eagerton*, 663 F.2d at 1040.

The *Eagerton* action was remanded to the district court for a determination as to whether the tax discriminated against the railroads. With regard to selecting the relevant class or classes of taxpayers to which the rail carriers were to be compared, the state argued that the entire tax structure must be considered. The railroads argued that the proper and relevant class for comparison was simply commercial and industrial taxpayers. The district court found in pertinent part:

> Even though § 11503(b)(4) [306(1)(d) ] does not specifically identify the relevant class or classes of taxpayers, §§ (1), (2), and (3) of 11503(b) establish commercial and industrial property as the standard by which ad valorem tax discrimination against rail carriers must be measured. Defendants have failed to suggest a class or classes of taxpayers which would serve as a more relevant class for comparison purposes. In light of the clear indication found in the body of

11503(b) that commercial and industrial taxpayers are to be considered in determining whether a tax discriminates against rail carriers, the Court finds that the class of commercial and industrial taxpayers is the relevant class to which rail carriers are to be compared under § 11503(b)(4).

*Alabama Great Southern Railroad Co. v. Eagerton*, 541 F.Supp. 1084, 1086 (M.D. Ala.1982).

The defendants make much of the district court's statement in *Eagerton* to the effect that the State of Alabama had failed to suggest a more relevant class for comparison. Yet, in its brief to the circuit court, Alabama had argued that the class against which a gross receipts license tax is levied, including telephone, telegraph and express companies as well as railroads, is a reasonable one.[8] Furthermore, at the district court level prior to the appeal, it was stipulated that virtually all other utilities in Alabama pay a license tax similar to the Alabama railroad license tax. It appears that Alabama attempted to rely on reasoning that the railroad and the utilities were the proper comparison class. Such reasoning is similar to the argument made by the defendants here that the carrier classification is reasonable and the tax applies equally to similarly situated businesses. The railroads argue that section 306(1)(d) serves to prohibit states from classifying railroads differently from other commercial and industrial taxpayers. Both *Eagerton* and legislative history are relied upon for support.

Legislative history provides the knowledge that prior to the enactment of the 4–R Act, the State of Tennessee had a property tax classification scheme under which railroad property and other utility property was assessed at a higher rate than commercial and industrial property. Members of Tennessee's congressional delegation attempted to amend the act in order to permit existing state classification schemes

---

**7.** See briefs filed by the parties in *Eagerton* (attached to the railroads' Post-Trial Brief, Appendix A, Tabs 1 and 2).

**8.** Plaintiffs' Appendix A, Tab 2 at 25, 29–30.

which "provide[d] for the reasonable classification of property for State purposes." 121 Cong.Rec. 38499, 90th Cong., 1st Sess. (1975). The amendments were not included, indicating congressional concern about the effect of classification schemes.

With respect to property taxes, the statute specifically refers to commercial and industrial property defined as all real or personal property "other than transportation property and land used primarily for agricultural purposes or primarily for the purpose of growing timber, which is devoted to a commercial or industrial use and which is subject to a property tax levy." § 306(3)(c). *See Louisville and Nashville Railroad Co. v. Dep't. of Revenue, State of Florida,* 736 F.2d 1495 (11th Cir.1984); *Trailer Train Co. v. State Bd. of Equalization,* 697 F.2d 860 (9th Cir.1983); *General American Transportation Corp. v. Louisiana Tax Commission,* 680 F.2d 400 (5th Cir.1982); *Clinchfield Railroad Co. v. Lynch,* 605 F.Supp. 1005 (E.D.N.C.1985);

*Burlington Northern Railroad Co. v. Dept. of Revenue of State of Wisconsin,* 604 F.Supp. 1575 (W.D.Wis.1985); *State of Tennessee v. Nashville R.R. Co.,* 478 F.Supp. 199 (M.D.Tenn.1979), *aff'd.* 652 F.2d 59 (6th Cir.1981), *cert. denied,* 454 U.S. 834, 102 S.Ct. 135, 70 L.Ed.2d 114 (1981); *Ogilvie v. State Bd. of Equalization of the State of North Dakota,* 492 F.Supp. 446 (D.N.D.1980) *affirmed,* 657 F.2d 204 (8th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981); *Louisville & N.R. Co. v. Louisiana Tax Commission,* 498 F.Supp. 418 (M.D.La. 1980).[9]

The body of section 306, taken as a whole, indicates that commercial and industrial taxpayers generally are the relevant comparison class. This conclusion is supported by the legislative history of the 4–R Act which indicates its purpose to be that of making the railroad industry more competitive in the capital markets, not merely

---

**9.** *Cf. Richmond, Fredericksburg & Potomac Railroad Co. v. Dept. of Taxation, Commonwealth of Virginia,* 762 F.2d 375 (4th Cir.1985). The State of Virginia imposes a corporate net income tax on railroads and other commercial and industrial corporations based on the corporation's federal taxable income subject to certain adjustments. Prior to 1979, railroads were subject to a franchise tax measured by gross transportation receipts and were not subject to the net income tax, and their income from sources other than transportation receipts was not taxed. In 1971, Virginia amended its income tax laws to conform to federal law. An "Extra Depreciation Deduction" was designed with a three-year carry-over in order to bring the Virginia adjusted basis of a taxpayer's depreciable property into line with the adjusted basis for federal purposes. Beginning in 1979, railroads were relieved of the franchise tax and made subject to the net income tax. The transitional modifications did not include an adjustment such as the Extra Depreciation Deduction. On its 1979 and 1980 Virginia income tax returns, the plaintiff claimed certain adjustments in line with an Extra Depreciation Deduction, which adjustments were denied by the tax department.

The Fourth Circuit affirmed the district court's comparison for determining discrimination with "that class of taxpayers which were newcomers to the corporate net income tax structure." The railroad argued that it should be compared to all other commercial and industrial taxpayers. Both the district court and the Fourth Circuit rejected this argument. As can be plainly seen from the following well-rea-

soned analysis, the situation was dissimilar to that presented here.

> To argue that the railroads are entitled to some equivalent of the Extra Depreciation Deduction on their depreciable property is to argue that the railroads were situated similarly to those commercial and industrial taxpayers who were brought into conformity with the federal income tax structure in 1972. This simply is not the case. In 1972 the railroads were not paying Virginia income tax.... The Extra Depreciation Deduction had no relevance to railroads in Virginia because prior to January 1, 1979, railroads had no Virginia income tax basis in their depreciable property.
>
> Furthermore, the Virginia corporate net income tax does not discriminate against railroads with respect to their nondepreciable property. It is axiomatic in income tax law that gain is not taxed until realized. Simply because prior to 1979 railroads were not under the Virginia corporate net income tax scheme (and thus any "gain" from the sale of an asset was nontaxable) gives them no logical reason for arguing that the increase in value of that property up to 1979 should somehow be exempt from Virginia income tax. No such deduction is provided by Virginia's income tax law to any other corporation newly coming under Virginia's corporate income tax.

*Richmond, Fredericksburg,* 762 F.2d at 381.

to place railroads in a competitive position with other carriers.

■ It thus appears that the statute and the subsection were enacted for the purposes of circumscribing state tax flexibility with regard to the ability to classify railroads differently from the general commercial and industrial taxpayer even if the classification arguably rests upon a reasonable basis and is in accord with Fourteenth Amendment and commerce clause principles.

### Proof of Discrimination: The Railroads' Model

The railroads have attempted to analyze and determine the manner of application of the B & O tax under the statute, the regulations of the West Virginia State Tax Department, and the relevant West Virginia cases.[10] They have constructed what they assert is an accurate model analyzing the impact of the B & O tax on their business activities as if they were subject to the tax. The railroads have divided gross revenues into four elements for purposes of their model. The elements are as follows:

a. Intrastate revenue from traffic beginning and ending within the State of West Virginia and switching and demurrage revenue earned within the state associated with interstate traffic movements.

b. Revenues from traffic which begins outside the State of West Virginia and terminates within the state.

c. Revenues from traffic which begins inside the State of West Virginia and terminates without the state.

d. Revenues from "bridge" traffic, that is, traffic which both begins and terminates outside the State of West Virginia but at some point crosses the state.

Plaintiffs' Trial Brief at 33.

From the tax model, the railroads have excluded from the tax base all revenues from elements c. and d. described above. To the revenues included in the model, the railroads have applied a 1.15% tax rate which is the rate applicable to the median B & O taxpayer in West Virginia. Tr. 62.[11] Tables were designed to show the alleged differences in actual carrier tax paid by the railroads as compared to the lesser taxes which would result from application of the B & O tax paid by other commercial and industrial taxpayers to railroad gross receipts. Using such a model and approach, the railroads argue that the carrier income tax does result in discriminatory taxation of railroads.

The defendants argue that the railroads' model ignores inherent differences in the types of businesses subject to each tax and misrepresents the scope of the B & O tax. It is stated that the B & O tax was tailored to businesses of an intrastate nature and

10. Initially, the railroads sought to demonstrate for alternative purposes of analysis that the net portion of the carrier income tax was a separate and distinct tax from taxes imposed on commercial and industrial taxpayers generally and was therefore discriminatory and that the gross portion of the carrier income tax is discriminatory on its face because of the rate of tax imposed. These two claims were abandoned, not argued orally and not addressed in the post-hearing briefs. Tr. 4, 5. As the railroads noted in their post-trial brief:

The contested issues in this case have been narrowed by the parties. The railroads, for their part, have reduced the issues by stating to the Court as follows: ... (b) The evidence principally relied upon by the railroads to prove tax discrimination is a comparison under West Virginia law of the combined gross

and net portions of the carrier income tax to the business and occupation tax applied to the average commercial and industrial taxpayer. Railroads' Post-trial Brief at 2.

11. The railroads engaged an expert in economics and applied statistics to examine the B & O tax classification data for the purpose of determining the tax rate applicable to the average B & O taxpayer. In his analysis, the expert employed statistical methods to calculate the median which involved the preparation of a frequency distribution table. Tr. 50–67 (Testimony of Dr. Frederick A. Ekeblad). The defendants do not dispute that the tax rate applicable to the median B & O taxpayer is 1.15%, nor that the average or mean would be close to that same figure. Tr. 111, 183.

that the activities subject to the tax are inherently local.

According to the defendants, the railroads' model, which does not reach business activities terminating outside West Virginia, is based on inaccurate characterizations of the B & O tax. Again, the defendants point to the primarily intrastate nature of the business activities subject to the B & O tax. Defendants assert that they have been increasingly aggressive in taxation and that the point of termination of activity is not the rule, but rather the propriety of imposing the B & O tax on activity involving interstate commerce is governed by principles of nexus. Defendants contend that West Virginia taxes business and occupation activity involved in interstate commerce to the full extent allowed by the Constitution. Defendants argue that "[t]here is no general rule which allows West Virginia to tax all interstate business terminating in the State or prevents West Virginia from taxing interstate activities which terminate outside the State. Each case must be examined individually to determine whether the taxpayer is conducting purposive revenue generating activities in the State and whether the State has sufficient nexus for those activities." Defendants' Response to Plaintiffs' Trial Brief at 19.

The railroads contend that the West Virginia Supreme Court of Appeals has adopted the self-apportionment concept under which the state in which business activity terminates may tax all revenue generated from the business activity. The railroads rely on *J.C. Penney Co. v. Hardesty*, 164 W.Va. 525, 264 S.E.2d 604 (1979); and *United Fuel Gas Co. v. Battle*, 153 W.Va. 222, 167 S.E.2d 890 (1969).

It is observed that the B & O tax is not a series of separate taxes but rather is a single privilege tax imposing different rates on different activities. Lathrop, *supra*, 85 W.Va.L.Rev. 307, 308 (1983). As an aid to discerning the scope of the B & O tax and determining whether the railroads' model, based on the place of termination of activity, is an accurate portrayal, the B &

O tax system will be analyzed in terms of its various classifications.

## A. Production of Natural Resources

The production privilege tax of various natural resource products is levied at different rates upon "every person exercising the privilege of engaging or continuing within [West Virginia] the business of severing, extracting, reducing to possession and producing for sale, profit or commercial use any natural resource products." W.Va.Code § 11–13–2a (1983 & Supp.1984). It is provided that "the measure of this tax is the value of the entire production in this State, regardless of the place of sale or the fact that the delivery may be made to points outside the State." *Id.* Value is defined as the "gross proceeds derived from the sale by the producer." *Id.* However, if the resources are shipped out-of-state, the taxable value is "the value immediately before transportation out-of-state." *Id.* Thus, the tax is measured in terms of the value of the product pursuant to sales receipts regardless of the place of sale or delivery.

## B. Manufacturing

Manufacturing activities taxed under the manufacturing privilege tax portion of the B & O tax are considered local activities and not part of interstate commerce. *Virginia Electric and Power Co. v. Haden*, 157 W.Va. 298, 200 S.E.2d 848 (1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1624, 40 L.Ed.2d 118 (1974). The measure of the tax base for manufacturing is "the value of the entire product manufactured, compounded or prepared in the State for sale, profit or commercial use, regardless of the place of sale or the fact that deliveries may be made to points outside the State." W.Va.Code § 11–13–2b (1983 & Supp.1985). Thus, the point of sale or delivery is not the controlling factor and manufacturing is defined as an intrastate activity.

When a product is partially manufactured within West Virginia and partially manufactured outside the state, the B & O

tax provides for an apportionment such that the measure is as follows:

That proportion of the sale price of the product that the payroll cost of manufacturing within this State bears to the entire payroll cost of manufacturing the product; or, at the option of taxpayer, the measure of his tax under this section shall be the proportion of the sales value of the article that the cost of operation in West Virginia bears to the full cost of manufacture of the articles.

W.Va.Code § 11–12–2b (1983 & Supp.1985). Thus, plainly within the manufacturing category the mechanical point of termination model simply does not apply.

## C. Selling Tangible Property

Every person engaged or continuing in West Virginia in the business of selling any tangible property is subject to the B & O tax pursuant to W.Va.Code § 11–13–2c. The measure of the tax is gross income which is comprised of receipts without any deductions for cost of goods sold or cost of doing business, except that a limited number of items such as cash discounts are excluded. W.Va.Code § 11–13–2c (1983 & Supp.1985).

The selling activities taxes under this section arguably constitute the classification most generally associated with interstate commerce. In determining taxation, the West Virginia State Tax Department has placed an emphasis upon the location of the solicitation aspect of the sale such that the state where the customer resides generally is considered to have sufficient nexus to tax. Thus, taxation of interstate sales is predominantly on selling activities which do in fact take place within West Virginia and which may also coincidentally terminate here. Defendants' Exhibit 2 at 10.[12] The tax is levied upon the business of selling, a single business activity, and not on the sale itself such that there may be incidental aspects of the selling activity occurring in states other than the state where the privilege of selling takes place. *See J.C. Penney,* 264 S.E.2d 604.

## D. Public Service or Utility Business

Pursuant to W.Va.Code § 11–13–2d (1983 & Supp.1985), a public service or utility business privilege tax is imposed upon any public service or utility business except businesses that are taxable pursuant to the carrier income tax. The tax is levied upon gross income received from the supplying of the service. It is specifically provided that "the measure of this tax shall not. include gross income derived from commerce between this State and other states of the United States or between this State and foreign countries." W.Va.Code § 11–13–2d (1983 & Supp.1985). The exclusion is based upon broad constitutional prohibitions.

As a practical matter, the interstate sales exclusion has little real effect. It is noted that toll bridges are subject to taxation of full gross receipts, water company sales rarely involve interstate commerce, and a natural gas company's sales are largely intrastate and all gas produced in West Virginia is also subject to the production tax of 8.63 per cent no matter where the place of sale. Additionally, insofar as public utility sales or generation of electricity in West Virginia are concerned, section 11–13–2d must be considered together with section 11–13–2m, which imposes a tax at the same rate as the public utility tax on the generation or production of electricity regardless of the place of sale or the fact that transmission may be to points outside West Virginia. *Duquesne Light Co. v. State Tax Dept.,* 327 S.E.2d 683 (W.Va. 1984). Thus, businesses engaged in the generation or production of electricity are taxed regardless of the place of sale.

## E. Contracting

The measure of the privilege tax upon contracting is the gross income of the busi-

---

**12.** The court observes that neither party has presented any data that demonstrates to what extent businesses are engaged in the interstate sales of tangible property. No information was provided detailing the extent to which a retail sales business' gross receipts are attributable to interstate as opposed to intrastates sales.

ness. W.Va.Code § 11–13–2e (1983 & Supp. 1985). Contracting is defined as "the furnishing of work, or both materials and work, in the fulfillment of a contract for the construction, alteration, repair, decoration or improvement of a new or existing building or structure, or any part thereof, or for the alteration, improvement or development of real property." W.Va.Code § 11–13–1 (1983 & Supp. 1985).

The railroads argue that the critical point in determining taxability is the place of the delivery of service. Language from West Virginia Reg. BOT. Section 3.2, "Doing Business Within and Without the State," is cited as authority by the railroads and provides:

> When the business involves a construction or installation contract in this state no deduction from the measure of the tax is permitted even though the contractor is domiciled outside the state and maintains a place of business outside the state which may contribute to the contract performed in this state.
>
> . . . .
>
> When the business involves a construction or installation contract outside this state the tax does not apply to any part of the income derived therefrom (except such part of the income as may be applicable to the manufacture in this state by the contractor of articles used or incorporated in such construction or installation) even though the contractor is domiciled in this state and maintains a place of business herein which may contribute to the contract performed outside the state.

The Tax Department does not consider contracting to be a multi-state venture. Rather, it is considered an intrastate activity with the primary taxable activity being defined as work performed on real property. Thus, the site of the real property fixes the location for privilege tax purposes. Tr. 112–16 and Defendants' Exhibit 2 "Analysis of the Business and Occupation Tax's Classification System."

*Pittsburgh-Des Moines Steel Co. v. Goodwin,* 164 W.Va. 525, 264 S.E.2d 604 (1979), is indicative of the importance of the erection or construction of real property element of the definition of contracting. The case involved a corporation which designed and fabricated steel structures generally used in water storage tanks in Pennsylvania. The structures were transported to West Virginia in pieces where they were erected by the taxpayer. The West Virginia Supreme Court of Appeals upheld the imposition of the B & O tax on the entire contract price despite the out-of-state design and fabrication, and noted that:

> All construction in West Virginia involves the assembling of parts manufactured outside the State of West Virginia. While the prefabrication of a storage tank out-of-state to be assembled in West Virginia is a spectacular example of out-of-state parts being assembled by a contractor, nonetheless, most of the toilets, hardware, kitchen equipment, carpet, windows, and heating systems installed in buildings constructed in West Virginia have been manufactured elsewhere.

*Pittsburgh-Des Moines Steel Co.,* 264 S.E.2d at 610–11.

The statute is specific in defining contracting with regard to real property. The validity of the taxation in the *Pittsburgh-Des Moines Steel Co.* case is tied to the operative definition of contracting and to the fact that the activity being taxed, namely the erection of fabricated materials, took place entirely within West Virginia. The tax is not predicated upon any notion of where the activity terminated. Rather, the definition of contracting dictates that the activity is virtually inherently intrastate.

**F. Business of Operating Amusements**

Pursuant to W.Va.Code § 11–13–2g (1983 & Supp.1985), a privilege tax is levied upon persons engaging within *West Virginia* in the business of operating a theatre, opera house, moving picture show, vaudeville, amusement park, dance hall, skating rink, racetrack, radio broadcasting station or any other place at which amusements are offered to the public. The tax is measured according to the gross income of

the business. It appears that by definition the activities taxed are totally intrastate.

G. Service Business

Service businesses are taxed pursuant to W.Va.Code § 11–13–2h (1983 & Supp.1985), which provides as follows:

Upon every person engaging or continuing *within this State* in any service business or calling not otherwise specifically taxed under this law, there is likewise hereby levied and shall be collected a tax equal to one and fifteen one-hundredths percent of the gross income of any such business. (Emphasis added.)

The classification constitutes the broadest category of business and occupation tax and serves as a catch-all provision to reach activities not appropriately taxable by any other classification. Although the defendants acknowledge that it is difficult to generalize on the nature of the activities taxed, they argue that the character of the major activities subject to the tax are primarily intrastate.

The case law supports the notion that the tax is levied upon all in-state service business activities primarily conducted in West Virginia, regardless of whether such activities terminate by delivery of the serviced goods in or out of West Virginia. *Arslain v. Alderson,* 126 W.Va. 880, 30 S.E.2d 533 (1944); *Hydraulics, Inc. v. Dailey,* 301 S.E.2d 605 (W.Va.1983). In both *Arslain* and *Hydraulics,* the court observed that the tax is levied upon the privilege of serving within this state rather than on income and that interstate transportation merely aided or was incidental to the intrastate activities.

The railroads assert, however, that under *Richardson Gordon & Assoc. v. Hardesty,* 264 S.E.2d 604 (W.Va.1979), the position taken is that the entire proceeds of a service contract are included in the business and occupation tax base if the termination of the activity occurs within West Virginia. *Richardson Gordon* involved a Pennsylvania engineering firm that had entered into several contracts with the West Virginia Department of Highways. According to

the contracts, services were performed and payment of professional fees made. *Richardson Gordon* contended that only five percent of the services rendered took place in West Virginia and only that percentage of the fees should be subject to the B & O tax. Upon detailing the work performed in West Virginia, which included survey work, soil sampling, public meetings with state officials and the establishment of a West Virginia branch office, the West Virginia Supreme Court of Appeals concluded that the entirety of the fees was subject to the tax.

It is simply not the case that *Richardson Gordon* established a mechanical rule that the destination state is permitted to tax the entire sales price. The court observed that a state of destination rule appeared to be a reasonable and workable method of apportionment. *Richardson Gordon,* 264 S.E.2d at 612. However, the court had no reason to further address the matter as proper apportionment was not at issue. The concern of the court was whether there was double taxation by West Virginia and Pennsylvania. The court found that Richardson Gordon had not shown any proof of duplication of taxation which would have made it incumbent upon both states to apportion their taxes. Thus, no arbitrary, mechanical rule was established by the dicta of the court.

H. Business of Furnishing Property for Hire

A privilege tax measured according to gross receipts is levied "upon every person engaging or continuing *within [West Virginia]* in the business of furnishing any real or tangible personal property, which has a tax situs in [West Virginia], or any interest therein for hire, loan, lease or otherwise, whether the return be in the form of rentals, royalties, fees or otherwise." W.Va.Code § 11–13–2i (1983 & Supp.1985). The businesses subject to this tax appear to be intrastate in nature.

I. Banking and Other Financial Businesses

A privilege tax upon the gross income from "interest, premiums, discounts, divi-

dends, service fees or charges, commissions, fines, rents from real or tangible personal property, however denominated, royalties, charges for bookkeeping or data processing, receipts from check sales, charges or fees, and receipts from the sale of tangible personal property" is levied upon persons engaging within West Virginia in the business of banking or other financial business. W.Va.Code § 11–13–2k (1983 & Supp.1985). The defendants assert that such businesses are inherently local.

### Taxation of Activities in Interstate Commerce

It is observed that the dispute between the parties is not one of constitutional dimension but, rather, is a claim of statutory 4–R Act discrimination. Plaintiffs' Post-Trial Brief, at 28, 33–34. Nevertheless, before undertaking further comparison of the railroads' model with the B & O tax coverage, it is helpful to an understanding of the scope of the coverage to review the development of concepts that have led to present-day taxation of interstate commerce by the states.

Historically, the United States Supreme Court made it plain that gross receipts taxes could not be levied on interstate transportation because any such action would be an improper attempt to regulate commerce. The concern of the Court that state taxes might ruin interstate commerce because of their cumulative effect led the Court to adopt a rule of tax immunity for interstate commerce. *Case of the State Freight Tax*, 82 U.S. (15 Wall.) 232, 21 L.Ed. 146 (1872); *Robbins v. Shelby County Taxing Dist.*, 120 U.S. 489, 7 S.Ct. 592, 30 L.Ed. 694 (1887). Yet, the Court acknowledged the conflicting interest of the states that interstate commerce should bear a share of the cost of government. Thus, the limit of the tax immunity rule was softened or limited through a number of unsound analytical techniques. *See, e.g., Pullman's Palace Car Co. v. Pennsylvania*, 141 U.S. 18, 11 S.Ct. 876, 35 L.Ed. 613 (1891) (upholding a tax as being "in substance and effect a tax on property used in interstate commerce, rather than on interstate commerce itself, and thus merely an *indirect* burden on commerce"); *Ficklen v. Shelby County Taxing Dist.*, 145 U.S. 1, 12 S.Ct. 810, 36 L.Ed. 601 (1892) (wherein application of tax immunity rule turned on whether an interstate business was involved in any local activities which could serve as the subject matter of the tax); *Maine v. Grand Trunk Railway*, 142 U.S. 217, 12 S.Ct. 121, 35 L.Ed. 994 (1891) (sustaining a tax by focusing on formal subject matter of privilege as opposed to effect on interstate commerce). *See also* J. Hellerstein and W. Hellerstein, State and Local Taxation 241 (1978).

The result of the confusing morass of decisions was that corporations engaged in interstate commerce were rendered subject to multiple taxation based on gross receipts from interstate commerce so long as the taxes were on different privileges. A corporation engaged in intrastate commerce would only be taxed once. Moreover, any tax which by its terms was levied on gross receipts from interstate commerce, rather than on a local privilege and measured by gross receipts, was automatically invalid even if it applied only to the gross receipts apportioned to business within the state. *See Philadelphia and Southern Steamship Co. v. Pennsylvania*, 122 U.S. 326, 7 S.Ct. 1118, 30 L.Ed. 1200 (1887). In sum, there was an elevation of form over substance. The irrational analysis relying primarily on semantics laid the groundwork for difficulties in reasoning that continue to plague the courts. *See* D. Shores, "State Taxation of Interstate Commerce: Quiet Revolution or Much Ado About Nothing," 38 Tax Law Rev. 127 (1982).

Finally, in *Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823 (1938), the Court made a departure in analysis and rejected the use of the direct/indirect test while placing an emphasis on considerations of multiple taxation. The effort to fashion an alternative to the tax immunity rule was not successful because *Western Live Stock* did not alter the traditional view that interstate commerce may not be taxed.

The decision involved New Mexico's application of a gross receipts tax to advertising revenue earned by a magazine publisher with substantial interstate circulation. The Court declared: "All the events upon which the tax is conditioned—the preparation, printing and publication of the advertising matter, and the receipt of the sums paid for it—occur in New Mexico and not elsewhere." *Western Live Stock*, 303 U.S. at 260, 58 S.Ct. at 550. The tax was deemed to be on local activities. The Court observed that the risk of multiple taxation was minimal or nonexistent. It seems that the Court attempted to employ a multiple taxation analysis without repudiating the tax immunity rule. Accordingly, for another some forty years, the Court applied the tax immunity rule in a formalistic manner. *See, e.g., J.D. Adams Manufacturing Co. v. Storen*, 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365 (1938); *Freeman v. Hewitt*, 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1946); *Spector Motor Service, Inc. v. O'Connor*, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951); *Railway Express Agency v. Virginia*, 347 U.S. 359, 74 S.Ct. 558, 98 L.Ed. 757 (1954); *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959).

Although the line of decisions displayed an increasing recognition by the Court of the importance and rights of states to tax participants in interstate commerce, a practical and rational analysis of gross receipts taxes had not been forthcoming. In *General Motors Corp. v. Washington*, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964), it was established that so long as an out-of-state seller maintained a presence within the market state, the state could tax, in full, receipts from sales with interstate elements without any apportionment. Local activities constituted the subject of the tax and the sales proceeds were deemed to be simply the measure of that tax.

In another landmark decision involving gross receipts taxes, the taxpayer had a single resident employee in the taxing state of Washington. *Standard Pressed Steel Co. v. Dep't of Revenue*, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975). The employee had the responsibility of maintaining a relationship with the primary customer, Boeing Corporation, to whom they supplied metal fasteners. The employee engaged in no direct sales activity. All negotiations regarding sales were carried on from out-of-state offices and orders filled from out-of-state inventories, with delivery by common carrier. Nevertheless, although the sales were interstate, the Court found that the in-state activity taxed could be permissibly measured by the total, unapportioned sales price since the sales were made to a local customer and thus "apportioned exactly to the activities taxed." *Standard Pressed Steel*, 419 U.S. at 564, 95 S.Ct. at 709.

■ It was not until 1977 when in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the Court signalled an economics-based analysis of potential burdens on interstate commerce. *Complete Auto* specifically rejected the rule that a "state tax on the 'privilege of doing business' is *per se* unconstitutional when it is applied to interstate commerce...." *Complete Auto*, 430 U.S. at 289, 97 S.Ct. at 1084. Under a *Complete Auto* analysis, four criteria are used to determine whether the commerce clause invalidates a state tax: (1) the activity must have a substantial nexus with the taxing authority; (2) the tax must be fairly apportioned; (3) the tax must not discriminate against interstate commerce; (4) the tax must be fairly related to services provided by the taxing jurisdiction. *Complete Auto*, 430 U.S. at 277–78, 97 S.Ct. at 1078.

In 1978, the Court made *Complete Auto* expressly applicable to a state gross receipts tax such as West Virginia's B & O tax. In *Department of Revenue of Washington v. Association of Washington Stevedoring Cos.*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978), the Court held that receipts from stevedoring activities carried on within the State of Washington were apportioned exactly to those activities.

All of the foregoing concepts and developments must be taken into account when

reviewing the scope of the B & O tax system in West Virginia and when analyzing the decisions of the West Virginia Supreme Court of Appeals. In so doing, the issue is placed in proper historical perspective and it is plainly apparent that it is simply inappropriate to flatly assert that the entire system relies solely on the termination or destination theory of taxation.

### Comparison of the Railroads' Model With the B & O Tax Coverage

According to the railroads, there are two overriding principles governing taxation pursuant to the business and occupation tax. First, if the business activity terminates in West Virginia, then the entire gross proceeds are taxed regardless of the fact that some of the activity took place in another state. Tr. 7. Second, if the business activity terminates outside the State of West Virginia, West Virginia taxes none of the gross proceeds of the transaction. Tr. 7.

In support of their model, the railroads rely heavily on *J.C. Penney Co., Inc. v. Hardesty*, 164 W.Va. 525, 264 S.E.2d 604 (1980), which involved four tax cases raising the issue of the extent to which a state may impose a tax upon activities in interstate commerce. With respect to B & O taxes, *J.C. Penney* was a trilogy of cases including *J.C. Penney Co., Inc. v. Hardesty, Pittsburgh–Des Moines Steel Co. v. Goodwin,* and *Richardson Gordon & Assoc. v. Hardesty.*

The *J.C. Penney* case, rather than evincing a destination theory, demonstrates the theoretical/analytical struggle in which the courts have engaged. The *Penney* case, although giving some credit to *Complete Auto,* relied on the concept of local presence. The court determined that an allegedly isolated interstate activity was in reality an integral part of local activity. The analysis is in accord with *General Motors* and *Standard Pressed Steel.*

*J.C. Penney* involved the imposition of tax on gross receipts from sales of dry goods and on gross receipts in the form of finance charges. The category of sales in controversy involved customer orders by mail direct to the out-of-state catalogue center where the merchandise is delivered back to the customer by mail or interstate carrier. The income from finance charges was also at issue and arose in association with the direct out-of-state mail order sales.

The West Virginia Supreme Court of Appeals held that the tax was valid in that there was fair apportionment, nondiscrimination, reasonable relationship to the services provided by the State, and sufficient contacts with the State to support a tax nexus. The court, making no reference to a termination theory, noted the following contacts with West Virginia:

> Credit applicants can obtain application forms from local stores; credit information and employment is verified by local West Virginia credit bureaus; direct mail orders are occasionally serviced by local stores; payments for direct mail sales may be made to local West Virginia stores; and the taxpayer uses local West Virginia collection agencies and the West Virginia court system to collect delinquent accounts. Furthermore, West Virginia provides consumer protection laws, usury laws, and credit laws which are enforced by West Virginia legal process.

*J.C. Penney,* 264 S.E.2d at 609–10. The court further found that J.C. Penney had not shown discrimination in fact against interstate commerce by duplication of any other tax levied in another jurisdiction.[13]

The testimony of Jack McCarty, who was accepted as an expert witness in the field of West Virginia business taxation, plainly indicates that the West Virginia Legislature was cognizant of federal case law and constitutional requirements. That awareness is reflected in the B & O tax system and in the carrier tax. In 1965, the West Virginia Supreme Court of Appeals declared the carrier tax which was formerly titled "Privilege Tax on Certain Carrier

---

**13.** The *Pittsburgh-Des Moines Steel Co.* and *Richardson Gordon* portions of the decision have been discussed at pp. 1474–1475, *supra.*

Corporations" unconstitutional. *State ex rel. Battle v. Baltimore & Ohio Railroad Co.*, 149 W.Va. 810, 143 S.E.2d 331, *cert. denied*, 384 U.S. 970, 86 S.Ct. 1859, 16 L.Ed.2d 681 (1966).

The court relied on United States Supreme Court cases and the principle that a "State is without power to impose a tax upon a foreign corporation for the privilege of engaging in interstate commerce and that such tax constitutes an unreasonable burden upon interstate commerce." *Baltimore & Ohio*, 143 S.E.2d at 338. The approach was based on semantics. In response to the formalistic approach of the court, the Legislature revised the tax statute essentially by deleting references to the term privilege. *See, e.g., Chesapeake & Potomac Co. v. State Tax Dep't.*, 161 W.Va. 77, 239 S.E.2d 918 (1977), wherein it was stated:

> A formal comparison of the old and new statutes clearly demonstrates that the new statutes substantially reenact the old. The new statutes change the tax rates and make minor changes in the way enterprises covered by these statutes are listed. Nonetheless, using substantially the same language, both old and new statutes tax certain carriers on gross income generated by business activity conducted entirely within the state and on apportioned net income generated by interstate business activity.

*Chesapeake & Potomac*, 239 S.E.2d at 923–24.

As has been observed then, "the semantic niceties which emanated from the Supreme Court decisions before *Complete Auto* perhaps forced on state legislatures an arbitrary 'tax as tax can' attitude with regard to interstate commerce, thereby producing a hodgepodge taxation." *Western Maryland Railway Co. v. Goodwin*, 282 S.E.2d 240, 245 (W.Va.1981). Moreover, it has been recognized that since *Complete Auto* the arbitrariness has remained and that opinions such as *J.C. Penney* have the appearance of allowing states sponge-like expansive taxing power. *Western Maryland Railway Co.*, 282 S.E.2d at 254. The *Western Maryland* opinion concluded with a plan to the legislature to re-evaluate its tax policy concerning interstate commerce and to take advantage of the rationalizing potential offered under *Complete Auto*. *Western Maryland Railway Co.*, 282 S.E.2d at 255. It can only be concluded that the West Virginia Supreme Court of Appeals is receptive to apportionment arguments but has in some respects been constrained by a system designed to account for historically prevalent formalistic semantic difficulties in characterizing and defining activities as local.

It is seen then that the West Virginia B & O tax, in the main, is imposed on intrastate activity. It also reaches the instate portion of interstate activity except when that portion is merely incidental to the primary purpose, scheme or focus of the overall activity. There simply is no statutory rule wherein taxation is based upon termination of activity. Nor has the West Virginia Supreme Court of Appeals itself adopted or imposed such a general rule of thumb. When goods are manufactured, electricity generated or natural resources extracted in West Virginia, that activity is plainly local in nature and subject to the B & O tax. It is readily divisible from the further activities of sale and transportation which may be either intrastate or interstate. As to the interstate sale, under the so-called self apportionment concept observed in West Virginia, generally an out-of-state sale and delivery by the seller of goods from this state is not subject to the tax, whereas a sale and delivery by the seller of goods into this state from outside is wholly taxed. The latter instance generally involves some activity in the other state, including transportation from that state, all of which is regarded as merely incidental to the sale taking place in this state to the end that the entire transaction is taxed here unless it is also similarly taxed in the other jurisdiction. The same concept governs contracting which is wholly taxed in West Virginia if the construction site is in this state, even though the office from which the project is managed is out-of-state.

It is against this backdrop that the railroads nevertheless contend that the B & O

tax reaches only intrastate activities and those interstate activities which terminate in West Virginia. They insist that interstate activities terminating out-of-state or simply passing through the state are not subject to the B & O tax. The railroads thus claim discrimination inasmuch as their interstate transportation activity of these same two types—i.e., pass through and out-of-state termination—are subject to the carrier income tax. The model suggested by the railroads is fundamentally flawed by their misplaced emphasis on the point at which interstate transportation activity terminates. Controlling West Virginia case law looks not simply to the place where the activity terminates, but to the place where the activity occurs sufficiently to permit taxation of all or the in-state portion of an interstate transaction.

As already illustrated, it is more accurate to conclude that the B & O tax is imposed on intrastate activity and, except where it is merely incidental to an out-of-state sale or other activity such as contracting, the in-state portion of interstate activity. When stated in these terms, it becomes clear that the carrier income tax does not discriminate against the railroads with respect to the scope of the activity taxed. Only the in-state portion of their interstate transportation activity is touched by the carrier income tax. None of it escapes taxation as being incidental inasmuch as the only activity involved is the very act of transportation itself from or through West Virginia. Transportation, then, is the essence of the activity taxed. When engaged in by a seller who transports his own goods to the point of sale, the movement or transportation may be regarded as incidental to the sale. When engaged in by a carrier, transportation is the heart and design of its business and the sole activity taxed. Where the interstate transportation begins or ends is of little or no moment. The focus is on where the transportation takes place.

Under the B & O tax, it is seen that some incidental in-state activity escapes and some incidental out-of-state activity is subjected to B & O taxation. The accommodation and adjustment so made respecting interstate activity is necessitated both by principles of fairness and of nexus. Adjustments of this sort are unnecessary under the carrier income tax applicable to railroads. In order to determine the extent of their transportation activity in West Virginia, the railroads are governed by a rather precise formula based on in-state cargo mileage. While it is to be acknowledged that the combined B & O and carrier income tax formulation is not without its rough edges, perfection in this complex setting is neither possible nor required. The scope of the activity taxed is essentially the same under each the B & O tax scheme and the carrier income tax design.

Having concluded that the scope of the activity taxed is substantially similar under each the B & O and carrier income tax formats, there remains the question of whether the tax yield under the carrier income tax is greater as to the railroads than it would be under the B & O tax scheme. As contended by the railroads and virtually conceded by the defendants, an average tax rate of 1.15% applies to the gross receipts of the body of B & O commercial and industrial taxpayers.[14] The defendants have calculated the effective rate that would apply to each of the railroads for each of the five years at issue, 1977 through 1981, if their West Virginia gross income were deemed to yield the amount of

---

**14.** The defendants justifiably object that a significant group of taxpayers is not included within the model presented by the railroads. Those businesses contributing to the general revenue by way of the carrier income tax are not "converted," for purposes of the model, as if they too were paying B & O taxes. Although the court has rejected the defendants' argument that the comparison of railroad taxation should be made only with similarly situated businesses (i.e., those taxed pursuant to the carrier tax), it does not follow that such similarly situated businesses should be excluded from an analysis of whether the state taxation system discriminates against railroads. As observed, the entirety of section 306 indicates that commercial and industrial taxpayers generally are the relevant comparison class. The statutory definition of commercial and industrial taxpayers does not exclude businesses such as those classed under the carrier tax scheme.

tax imposed under the carrier income tax law. The carrier gross income tax on intrastate activities at 3.3% has been added to the carrier net income tax on the in-state portion of interstate activities at 6.6%. The in-state portion of the net has been calculated according to the statutory formula by which the in-state portion is essentially taken to be that sum found by multiplying the carrier's total net income by the proportion which the carrier's West Virginia cargo mileage bears to its total cargo mileage in all states. The in-state portion of the gross from interstate activity is calculated in the same fashion in order to add it to the intrastate gross and establish the comparable gross receipts figure that would be taxable under a B & O scheme. When the tax reflected on the carrier income tax returns is measured against the gross receipts, the effective rate is seen to be substantially less than the 1.15 per cent average for all commercial and industrial taxpayers, as follows:

| Railroad | 1977 | 1978 | 1979 | 1980 | 1981 | 5-year Weighted Average |
|---|---|---|---|---|---|---|
| B & O | .23% | .31% | .28% | .39% | .41% | |
| C & O | .29% | .30% | .26% | .31% | .37% | |
| Western Maryland | 1.88% | .95% | 1.45% | .22% | .18% | .54% |

Although two of the Western Maryland years exceed 1.15 per cent, the weighted average of all five Western Maryland years is .54 per cent.

The defendants have made a further calculation based on a greater amount of tax that consists of the tax reflected on the carrier's returns and an additional assessment made by the State but not finalized for each of the years 1977–1980. The results still leave the effective rate well below the 1.15 per cent benchmark.

| Railroad | 1977 | 1978 | 1979 | 1980 | 4-year Weighted Average |
|---|---|---|---|---|---|
| B & O | .38% | .50% | .45% | .60% | |
| C & O | .48% | .48% | .39% | .46% | |
| Western Maryland | 2.50% | 1.21% | 1.72% | .30% | .99% |

Three of the Western Maryland years exceed 1.15 per cent but the weighted average for all four years falls to .99 per cent when the fourth year is taken into account.

The calculations furnished by the defendants appear to be reasonable and accurate. The Railroads concede that it is their burden to prove the existence and extent of the alleged discrimination in violation of subsection 306(1)(d). Plaintiffs' Reply at 8; Plaintiffs' Post-Trial Brief at 6. Yet, having relied on an invalid model, they have proved up nothing except for the 1.15 per cent average applicable to commercial and industrial taxpayers other than carriers.[15] Indeed, it is plain from the record in this case that no discrimination against the railroads has taken place under the Railroad Revitalization and Regulatory Reform Act of 1976 for the years in question.

Accordingly, it is ORDERED that the request by the railroads for declaratory and injunctive relief be, and it hereby is, denied.

There being nothing further to be adjudicated in this case, the Clerk is directed to

15. During West Virginia's fiscal year ending June 30, 1982, the carrier income tax generated $21,736,351.87, the B & O tax generated $518,- 502,546.72, and total general fund revenues were $1,265,913,052.45. Lathrop, *supra*, 85 W.Va.L.Rev. 307–08, nn. 4, 5.

strike this civil action from the docket of the court.

The Clerk is further directed to forward certified copies of this order to all counsel of record.